# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1176 and 2011AP1177 |
| COMPLETE TITLE: | In re the estate of Nancy Ellen Laubenheimer: |

Joseph McLeod,
        Petitioner-Respondent,
   v.
Patricia Mudlaff n/k/a Patricia Guske, Barbara
Nigh and Millard Laubenheimer,
        Objectors-Appellants.

-------------------------------------------------

In re the estate of Nancy Ellen Laubenheimer:

Patricia Mudlaff n/k/a Patricia Guske, Barbara
Nigh and
Millard Laubenheimer,
        Appellants,
   v.
Joseph McLeod,
        Respondent.

## ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 16, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 12, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Washington |
| JUDGE: | Andrew T. Gonring |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ZIEGLER, J., dissent. (Opinion filed.) GABLEMAN, J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

    For the objectors-appellants, there were briefs by *Gregory S. Mager* and *O'Neil, Cannon, Hollman, DeJong & Laing S.C.*, Milwaukee, and oral argument by *Gregory S. Mager*.

For the petitioner-respondent, there was a brief by *Alan L. Spiegel*, *Paul Bugenhagen Jr.*, and *Mclario, Helm & Bertling S.C.*, Menomonee Falls, with oral argument by *Alan L. Spiegel*.

2013 WI 76

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2011AP1176 & 2011AP1177
(L.C. No. 2009PR25 & 2009PR26)

STATE OF WISCONSIN      :      IN SUPREME COURT

In re the estate of Nancy Ellen Laubenheimer:

Joseph McLeod,

       Petitioner-Respondent,

     v.

Patricia Mudlaff n/k/a Patricia Guske,
Barbara Nigh and Millard Laubenheimer,

       Objectors-Appellants.

**FILED**

**JUL 16, 2013**

Diane M. Fremgen
Clerk of Supreme Court

---

APPEAL from an order of the Circuit Court for Washington County, Andrew T. Gonring, Judge. *Reversed and cause remanded.*

¶1 DAVID T. PROSSER, J. These consolidated estate cases are before the court on certification from the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (2009-10).[1]

¶2 The cases arise from competing petitions for the appointment of a personal representative and the formal

---

[1] All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

administration of the estate of Nancy Ellen Laubenheimer (Laubenheimer). Joseph McLeod (McLeod) filed a petition for formal administration of Laubenheimer's estate and his appointment as personal representative. He also asserted his right, as Laubenheimer's husband, to a share of her estate. Patricia Mudlaff (Patricia), Laubenheimer's stepdaughter, also filed a petition for formal administration and appointment as personal representative. Patricia asserted that Laubenheimer's marriage to McLeod was invalid because Laubenheimer lacked the mental capacity to consent to the marriage to McLeod. Thus, Patricia asked the circuit court to declare Laubenheimer's marriage void, making McLeod ineligible to receive a share of Laubenheimer's estate.

¶3    The principal issue in this case is whether a court has the authority to declare a marriage void after the death of one of the parties to the marriage.

¶4    The Washington County Circuit Court[2] rejected Patricia's argument, concluding that annulment was the only method to void a marriage and that a Wisconsin statute prohibits annulment after the death of one of the parties to the marriage.

¶5    We reverse. In Ellis v. Estate of Toutant (Estate of Toutant), 2001 WI App 181, 247 Wis. 2d 400, 633 N.W.2d 692, the court of appeals held that there is a fundamental distinction between annulment and a judicial declaration that a marriage is void. The court of appeals further held that in an estate

---

[2] Judge Andrew T. Gonring presiding.

2

action challenging a marriage, a court may use its declaratory judgment powers to declare that a marriage prohibited by law was void and incapable of validation by the parties to the marriage.

¶6    We conclude that the holdings and analysis in Estate of Toutant are correct.    Annulment is certainly an appropriate remedy to void a marriage when the parties to the marriage are still alive, but it is not the exclusive remedy to challenge the validity of a marriage.    The common law drew a distinction between an annulment and a declaration that a marriage was void, especially a declaration after the death of one of the parties. Our statutes and case law have preserved that distinction.

¶7    Wisconsin Stat. ch. 765 sets out the criteria for a valid marriage in this state.    Failure to meet one of these criteria will often result in a void marriage.    An action under the Uniform Declaratory Judgments Act (the UDJA) is the established mechanism for testing the validity of a marriage in an estate case because the UDJA explicitly provides standing for interested parties in an estate action.

¶8    The change in the annulment statute in 2005 Wis. Act 443 did not alter the holdings in the Estate of Toutant case. There is no evidence that the legislature sought to curtail a court's power to address fraud, mistake, and other exigencies in a disputed marriage in order to "declare rights, status, and other legal relations."    Wis. Stat. § 806.04(1).    Limiting a court's power to address these issues would effectively shut off declaratory remedies for parties in an estate action.

3

¶9    We remand the case to the circuit court for further action consistent with this opinion.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

¶10   Nancy and Luke (Luke) Laubenheimer were married 30 years before Luke's death in 2001.  Their marriage produced no children, but Luke had three children from a previous marriage.  Two of those children, Patricia and Millard (Millard) Laubenheimer, are parties in this case.  Laubenheimer never adopted Luke's children.

¶11   Laubenheimer executed a will in 1999 leaving the bulk of her estate to Luke, but if Luke died before she did, the bulk of Laubenheimer's estate was to be distributed to Luke's children.  Laubenheimer did not alter this will in the decade after Luke's death.

¶12   Laubenheimer suffered a stroke in January 2007.  From that time until her death in February 2009, Laubenheimer also suffered from hypertension, insulin-dependent diabetes, and renal failure.  At some point, McLeod came to live with Laubenheimer.  McLeod claims that he lived with her beginning in

4

July 2003.   His presence in her home clearly preceded March 2007.[3]

¶13 On October 1, 2008, Community Memorial Hospital in Menomonee Falls admitted Laubenheimer with stroke-like symptoms, including "right side weakness, difficulty speaking, and facial droop."   Two doctors at the hospital noted Laubenheimer's diminished mental capacity.   On October 11, Dr. Lisa M. Rich and Dr. Colleen Poggenburg signed a "Statement of Incapacitation," concluding that Laubenheimer was "unable to receive and evaluate information effectively or to communicate decisions" and that she lacked the capacity to make health care decisions.   The Statement of Incapacitation activated Laubenheimer's health care power of attorney, which designated Laubenheimer's cousin, Diane Kulpa, to serve in that capacity.   Laubenheimer's mental state purportedly never improved and the health care power of attorney remained in effect until she died.

¶14 On October 13, 2008, Laubenheimer was transferred from Community Memorial Hospital to Virginia Highlands Health and Rehabilitation Center (Virginia Highlands), a nursing home in

---

[3] A March 2007 Washington County Sheriff's Department case report indicates that a sheriff's deputy conducted a welfare check of Laubenheimer's home based on a call from an Aurora Health nurse assigned to take care of Laubenheimer.   The case report identified McLeod as "Clark McLeod."   Although the case report noted that Laubenheimer admitted to "Clark" getting "rather upset" at times, and that the nurse expressed concern about "Clark" not allowing Laubenheimer to get the care she required, apparently neither the deputy nor the Washington County Division of Social Services took any further action in regard to this report.

Washington County.  From the time of her admittance to Virginia Highlands until her death on February 5, 2009, Laubenheimer was treated by Dr. Dirk Steinert, the attending physician at the nursing home.

¶15  McLeod removed Laubenheimer from Virginia Highlands on October 27, 2008, to obtain a marriage license.  He removed her again on November 3[4] for a marriage ceremony before Washington County Court Commissioner Jeffrey A. Jaeger.  McLeod did not inform Laubenheimer's family, friends, doctors, or social workers about the wedding.  A representative of a medical insurance carrier for Laubenheimer was the first to communicate the marriage of Laubenheimer and McLeod to a member of the Virginia Highlands staff.

¶16 On January 13, 2009, Patricia filed petitions in Washington County Circuit Court seeking temporary and permanent guardianship of the person and the estate for Laubenheimer, as

---

[4] Patricia's brief and the court of appeals certification state that McLeod removed Laubenheimer from Virginia Highlands on November 3 to obtain a marriage license and that they were married on November 7.  McLeod's brief and the circuit court decision state that McLeod removed Laubenheimer on October 27 and again on November 3.  McLeod referred to both sets of dates in the circuit court, while Patricia consistently referred to the November 3 and November 7 dates.  The discrepancy in dates does not affect our holding in any way.

well as protective placement.[5]  Patricia's guardianship petition alleged that Laubenheimer "suffer[ed] from severe cognitive disability due to several strokes."  In addition, the guardianship petition claimed that McLeod "continues to interfer[e] with [Laubenheimer's] necessary health care in contravention of the direction of [Laubenheimer's] health care power of attorney."  One example of this interference, according to the petition, was McLeod discharging Laubenheimer from Virginia Highlands against medical advice.  Patricia alleged that Laubenheimer needed a guardian to readmit her to the nursing home.

¶17 Patricia's guardianship petition also contained an examining physician's report from Dr. Steinert, opining that Laubenheimer was incompetent and in need of a guardian.[6]

¶18 On January 27, 2009, the circuit court appointed Laubenheimer's power of attorney for health care, Diane Kulpa, as temporary guardian of Laubenheimer's person, and Barbara Nigh (Nigh), Laubenheimer's sister, as temporary guardian of

---

[5] On the same date, Patricia filed a Temporary Restraining Order and Injunction against McLeod, alleging that Laubenheimer was an elderly at-risk individual and that McLeod abused and financially exploited her.  According to Consolidated Court Automated Programs (CCAP) records, the circuit court granted the temporary restraining order immediately, but the court dismissed the pending injunction against McLeod because of Laubenheimer's death.

[6] Dr. Steinert's report concluded that Laubenheimer had "cognitive inability to comprehend long[-]term or even short[-]term concerns (health, welfare related & therefore probably financial)."

7

Laubenheimer's estate, concluding that there was a "reasonable likelihood" Laubenheimer was incompetent.[7]

¶19 Laubenheimer died at Virginia Highlands on February 5, 2009, while the permanent guardianship proceedings were pending. In a letter dated February 7, 2009, Dr. Steinert concluded that at no time after Laubenheimer's admission to Virginia Highlands (including the date of the November marriage ceremony) did she have sufficient capacity to consent to marriage.

¶20 On June 9, 2009, McLeod filed a petition for formal administration of Laubenheimer's estate, requesting that the court appoint him as personal representative and asserting his right to a share of Laubenheimer's estate. McLeod attached a copy of Laubenheimer's October 13, 1999, will, but claimed that the will was not "properly executed" or "valid," and that after a "diligent inquiry," he was unable to find the original will or any subsequent wills executed by Laubenheimer. McLeod asserted that because the 1999 will was executed prior to his marriage to Laubenheimer, he had a right to a share of his wife's estate under Wis. Stat. § 853.12. Section 853.12(1) provides that "if the testator married the surviving spouse . . . after the testator executed his or her will, the surviving spouse . . . is entitled to a share of the probate estate." The surviving spouse's share is equal to what his or her share would be if the

---

[7] Patricia's petition for temporary guardianship of the estate requested the authority to "[f]ile an objection and/or annulment of purported marriage between [Laubenheimer] and Joseph C. McLeod." In its order granting the temporary guardianship, the circuit court denied this additional power.

testator died intestate, minus devises made to the testator's children and their issue.  Wis. Stat. § 853.12(2).  McLeod argued that inasmuch as Laubenheimer did not have any biological children and never adopted Luke's children, he was the sole heir of Laubenheimer's estate.

¶21 The next day, June 10, 2009, Patricia[8] also filed a petition for formal administration of Laubenheimer's estate, seeking to be named co-personal representative of the estate with her brother Millard.[9]  Patricia asked the court to admit a conformed copy[10] of Laubenheimer's will into probate.  Patricia also argued that Laubenheimer's marriage to McLeod was invalid on grounds that Laubenheimer lacked the mental capacity to enter

---

[8] For the sake of simplicity, the objectors/appellants Patricia, Millard, and Nigh will be referred to as "Patricia" hereinafter.

[9] Patricia also filed an objection to McLeod's petition for formal administration and appointment as personal representative.

[10] A conformed copy is "[a]n exact copy of a document bearing written explanations of things that were not or could not be copied, such as a note on the document indicating that it was signed by a person whose signature appears on the original." Black's Law Dictionary 385 (9th ed. 2009).  Patricia claims that the conformed copy of Laubenheimer's will was obtained from the attorney who drafted substantially identical wills for Laubenheimer and Luke.

into a marriage contract, and therefore McLeod had no right to a surviving spouse's share of Laubenheimer's estate.[11]

¶22 In a written decision dated December 23, 2009, the circuit court recognized that the issue of whether it had the authority to invalidate the Laubenheimer-McLeod marriage after Laubenheimer's death would "control the course of this estate." Examining the statutes, in particular Wis. Stat. § 767.313, the circuit court concluded that "the only way a marriage may be invalidated in the state of Wisconsin is through annulment. However, pursuant to Wis. Stat. [§] 767.313(2), no marriage may be annulled after the death of a party to the marriage." Thus, the court rejected Patricia's argument that it had the power to invalidate the marriage. The circuit court subsequently affirmed its decision in an order dated February 21, 2011, while granting McLeod's petition for formal administration and denying Patricia's petition.[12] However, the circuit court, cognizant of Patricia's intention to appeal the order, appointed a neutral party to serve as personal representative of the Laubenheimer estate.

---

[11] Nigh filed a petition to be found an interested person and to join Patricia and Millard for formal administration of the estate. Nigh was Laubenheimer's sister, which would make her an intestate beneficiary if the court found Laubenheimer's marriage to McLeod invalid and the conformed will was not admitted into probate.

[12] Patricia appealed the circuit court's December 23, 2009, decision to the court of appeals. The court of appeals decided that the December 23 decision of the circuit court was not an appealable order because it was not a final order or judgment.

¶23 Patricia appealed. The court of appeals certified the matter to this court, and we accepted the certification on October 17, 2012.

## II. STANDARD OF REVIEW

¶24 In this case, we must determine whether the statutes allow a court, in an estate case, to declare a marriage void after the death of one of the parties. Statutory interpretation presents a question of law that this court reviews de novo. Wis. Dolls, LLC v. Town of Dell Prairie, 2012 WI 76, ¶19, 342 Wis. 2d 350, 815 N.W.2d 690; Zwiefelhofer v. Town of Cooks Valley, 2012 WI 7, ¶20, 338 Wis. 2d 488, 809 N.W.2d 362.

## III. ANALYSIS

¶25 This case presents a legal issue about the authority of a Wisconsin court to pass on the validity of a marriage after the death of one of the parties to the marriage. In addressing this issue, our intent is to avoid any determination by this court of the validity of the marriage between Laubenheimer and McLeod.

¶26 The parties in this case offer very different interpretations of the statutes and cases on the legal issue of whether a court may evaluate the validity of a marriage after the death of one of the parties.

¶27 McLeod focuses on Wis. Stat. § 767.313. He contends that annulment is the exclusive means to invalidate a void or voidable marriage, and that § 767.313(2) absolutely prohibits a marriage from being annulled after the death of a party to the marriage.

11

¶28 Patricia concedes that under Wis. Stat. ch. 767, a court cannot annul the Laubenheimer-McLeod marriage. However, Patricia relies on several provisions in Wis. Stat. ch. 765 that prohibit a marriage in various situations and state that a marriage is void if one of those provisions is violated. One of the provisions in Wis. Stat. ch. 765 prohibits marriage where a party has such want of understanding as renders him or her incapable of assenting to marriage. Wis. Stat. § 765.03(1). Patricia claims that a court has authority under Wis. Stat. § 806.04(4) to declare such a marriage void in an estate case even after the death of one of the parties.

¶29 When interpreting a statute, "we begin with the language of the statute, because it is the language that expresses the legislature's intent." Hocking v. City of Dodgeville, 2010 WI 59, ¶18, 326 Wis. 2d 155, 785 N.W.2d 398 (citing State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶¶44-45, 271 Wis. 2d 633, 681 N.W.2d 110). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Kalal, 271 Wis. 2d 633, ¶45. The scope, context, and purpose of a statute, derived from statutory text and structure, are perfectly relevant to a plain-meaning interpretation. Id., ¶48. Statutory history also is part of a plain-meaning analysis. Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581. Legislative history may be

12

relevant to confirm a statute's plain meaning.   Kalal, 271 Wis. 2d 633, ¶51.

### A. Current Marriage Law in Wisconsin

¶30 We begin our analysis with the current statutes. Marriage requirements are determined by statute.   See Watts v. Watts, 137 Wis. 2d 506, 519 n.11, 405 N.W.2d 303 (1987) (noting that Wisconsin abolished common law marriage in 1917); see also § 3, ch. 218, Laws of 1917.

¶31 Wisconsin Stat. ch. 765 is entitled "Marriage" and it lays out the requirements for entering into marriage in Wisconsin.   Wisconsin Stat. § 765.001(2) explains the intent behind Wis. Stat. chs. 765 through 768, "The Family Code":

> It is the intent of chs. 765 to 768 to promote the stability and best interests of marriage and the family. . . . Marriage is the institution that is the foundation of the family and of society.   Its stability is basic to morality and civilization, and of vital interest to society and the state.   The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. . . .   The impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned.

Wis. Stat. § 765.001(2).   Section 765.001(3) states that The Family Code "shall be liberally construed to effect the objectives" in § 765.001(2).

¶32 Marriage in Wisconsin, "so far as its validity at law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting is essential."  Wis. Stat. § 765.01 (emphasis added).   See also Campbell v. Blumberg, 260

Wis. 625, 628, 51 N.W.2d 709 (1952) ("[M]arriage is a civil contract. It is different from ordinary contracts in that it cannot be modified or abrogated by the parties themselves. Once entered into, a valid marriage contract continues until the contract is changed by law or by the death of one of the parties.").

¶33 Wisconsin Stat. ch. 765 prohibits marriage between parties in certain situations. Only competent persons who have attained the age of 18 may marry in this state, although a person between 16 and 18 years of age may marry with the requisite parental permission. Wis. Stat. § 765.02. Wisconsin Stat. § 765.03 lists four situations in which marriage shall not be contracted: (1) "while either of the parties has a husband or wife living"; (2) when the parties "are nearer of kin than 2nd cousins" (with certain exceptions); (3) when "either party has such want of understanding as renders him or her incapable of assenting to marriage"; and (4) when any person who is or has been a party to a divorce in this state or elsewhere marries again within six months after the judgment of divorce is granted. In addition, Wis. Stat. § 765.04 forbids a marriage when a person who is prohibited from marrying in this state goes into another state or country and contracts a marriage prohibited under the laws of this state. Finally, Wis. Stat. § 765.16 states that a marriage "may be validly solemnized and contracted in this state only after a marriage license has been issued therefor," and only after mutual declarations by the

14

parties in front of an authorized officiating person and witnesses.

¶34 Wisconsin Stat. § 765.21 declares that all marriages contracted in violation of the above sections "shall be void," excepting for immaterial irregularities. "'[V]oid' means null and void and not voidable." Wis. Stat. § 765.002(6). However, § 765.21 allows the parties to a void marriage to validate it by complying with any of the requirements set forth in the above cited provisions of Wis. Stat. ch. 765 "if the marriage is declared void." (Emphasis added.) In other words, the impediments to a valid marriage must be removed before the void marriage may be validated.[13]

¶35 Wisconsin Stat. ch. 767 is entitled "Actions Affecting the Family." Actions in this chapter include, inter alia, annulment. Wis. Stat. § 767.001(1)(b). Wisconsin Stat. § 767.313(1) lists the grounds for an annulment suit brought by a party, a parent or guardian, or a legal representative:

> (a) A party lacked capacity to consent to the marriage at the time the marriage was solemnized, either because of age, because of mental incapacity or infirmity or because of the influence of alcohol, drugs, or other incapacitating substances, or a party was induced to enter into a marriage by force or

---

[13] We note that Wis. Stat. § 765.21 declares certain alleged marriages to be "void," yet the section states how those same void marriage can be validated by the parties. See also John P. Foley, Comment, The Voidable Void Marriage in Wisconsin, 49 Marq. L. Rev. 751 (1966). However, this statute is of no moment in a collateral proceeding such as an estate action; the death of an incapacitated party means that the marriage is incapable of validation by the parties.

duress, or by fraud involving the essentials of marriage. . . .

(b) A party lacks the physical capacity to consummate the marriage by sexual intercourse, and at the time the marriage was solemnized the other party did not know of the incapacity. . . .

(c) A party was 16 or 17 years of age and did not have the consent of his or her parent or guardian or judicial approval, or a party was under 16 years of age. . . .

(d) The marriage is prohibited by the laws of this state. . . .

Wis. Stat. § 767.313(1). The same section contains a provision that "[a] judicial proceeding is required to annul a marriage. A marriage may not be annulled after the death of a party to the marriage." Wis. Stat. § 767.313(2).

¶36 This annulment provision is central to the matter before us. McLeod asserts that a marriage cannot be voided except by annulment, and annulment is not available when one of the parties is deceased. Patricia, on the other hand, relies on provisions throughout Wis. Stat. ch. 765 that seem to say that unless certain conditions are met, a marriage is void from its inception. Patricia asserts that a court has the power to declare a marriage void outside the annulment process in Wis. Stat. ch. 767.

B. <u>Estate of Toutant</u>: Courts Have the Power to Declare
a Marriage Void After the Death of One of the Parties
to the Marriage

16

¶37 When the parties to a marriage are alive, the appropriate remedy for voiding a marriage is annulment.[14] However, at common law, when one of the parties died, such that any impediment to a valid marriage was no longer capable of being corrected, a declaration that a marriage was void was the proper remedy.  Our case law has retained this common law principle, and the most recent example is Estate of Toutant.

¶38  In Estate of Toutant, a Wisconsin resident, Toutant, married a Scottish national named Ellis in Texas only 30 days

---

[14] Although the appropriate method for voiding a marriage when the parties are alive is annulment under Wis. Stat. § 767.313, an annulment action is not the only method for testing the validity of a marriage.

For example, Wis. Stat. § 767.18, entitled "Actions to affirm marriage," reads:

> If the validity of a marriage is denied or doubted by either of the parties the other party may commence an action to affirm the marriage.  The judgment in an action to affirm marriage shall declare the marriage valid or annul the marriage, and is conclusive upon all persons concerned.

If the judgment "is conclusive upon all persons concerned," persons concerned must have the opportunity to present evidence that the marriage was and is void, as where one of the parties is still married to another person.  See Kitzman v. Kitzman, 167 Wis. 308, 166 N.W. 789 (1918).

In addition, a declaratory judgment action under Wis. Stat. § 806.04(1) or (4) may be filed by an interested person who is able to satisfy the standing requirements under the declaratory judgment statute.  This is signaled by a close reading of Wis. Stat. § 765.21: "The parties to any such marriage may validate the marriage by complying with the requirements of ss. 765.02 to 765.24 as follows: (1) At any time, if the marriage is declared void under s. 765.02 or 765.16." (Emphasis added.)

17

after Ellis's Scottish divorce.    Estate of Toutant, 247 Wis. 2d 400, ¶¶3, 6.    Toutant died shortly after returning to Wisconsin with Ellis.    Id., ¶7.    Toutant died testate, but Ellis filed a Surviving Spouse's Selection of Personal Property, selecting the bulk of Toutant's personal property.    Id., ¶8. The personal representative of the estate filed a petition for a declaratory judgment asking the circuit court to declare the marriage of Toutant and Ellis null and void.    Id., ¶9.    The circuit court ruled that the marriage was void because it "violated Wisconsin's six-month waiting period between a divorce and a subsequent marriage."    Id., ¶11.

¶39 Ellis argued that the circuit court did not have the authority to annul the marriage because a marriage cannot be annulled after the death of one of the parties.    Id., ¶15.    The court of appeals agreed with this assertion, but noted that "the estate was not asking the marriage to be annulled."    Id. (internal quotation marks and brackets omitted).    Instead, the estate was asking the circuit court to declare the marriage null and void.    Id.

¶40 The court of appeals looked to then-Wis. Stat. § 767.03 (1999–2000), which stated that judicial proceedings were needed to annul or hold void a marriage, and "[n]o marriage may be annulled after the death of either party to the marriage."    The court of appeals concluded that the second part of this provision "pointedly prohibits only annulment after the death of either spouse.    Thus, a marriage can be declared null

18

and void after the death of a spouse."  Id., ¶16 (emphasis added).

¶41 Ellis argued that his marriage to Toutant was, at most, a voidable marriage and thus was valid until subsequently annulled.  Id., ¶25.  However, the court of appeals held that such distinction was beside the point because it ignored the plain language of the applicable statute: Wis. Stat. § 765.03(2) "specifically states that a 'marriage . . . solemnized before the expiration of 6 months from the date of the granting of judgment of divorce shall be void,'" and void means "null and void and not voidable."  Id., ¶¶25-26 (quoting Wis. Stat. §§ 765.03(2) and 765.002(6) (1999-2000)).

¶42 Therefore, the court of appeals affirmed the circuit court's use of its declaratory judgment powers to void the Toutant-Ellis marriage.  See id., ¶12 n.1 (citing Wis. Stat. § 806.04(1) and (4)(c), the UDJA).

¶43 There is a clear statutory and case law basis for the Estate of Toutant court's conclusion.  The common law drew a distinction between annulment and declaring a marriage void after death, and that distinction has been preserved.

¶44 Wis. Stat. ch. 78 of the Revised Statutes of 1849 was titled "Of Marriage," similar to what Wis. Stat. ch. 765 is titled today.  It contained several sections relating to the incapability of certain individuals to contract marriage——including mental incapability——and additional requirements for marriage.  Wis. Stat. ch. 79 of the 1849 Revised Statutes, titled "Of Divorce," also contained a section that declared that

19

certain marriages prohibited by law "shall be void," including those in which either of the parties was incapable of assent because of want of understanding.  Wis. Stat. ch. 79, § 2 (1849).  Furthermore, Section 3 read that: "When a marriage is supposed to be void, or the validity thereof is disputed, . . . either party may file a petition . . . for annulling the [marriage] . . . and upon due proof of the nullity of the marriage, it shall be declared void."  Wis. Stat. ch. 79, § 3 (1849).  However, Section 5 stated that a marriage of an "insane person" shall not be declared void after "his restoration to reason" if it appeared that the parties cohabitated together for a time and the incapacitated person was "restored to a sound mind."  Wis. Stat. ch. 79, § 5 (1849).

¶45 In sum, our first statutory compilation prohibited certain marriages and deemed these prohibited marriages "void." Furthermore, the first statutory compilation set out a petition for annulment as the mechanism to declare a marriage void during the life of the parties.[15]

¶46 The case of Williams v. Williams, 63 Wis. 58, 23 N.W. 110 (1885), was an ejectment action that interpreted these marriage provisions.  The issue in Williams was whether the plaintiff was still married to her first husband (who also may

---

[15] Wis. Stat. ch. 78 "Of Marriage" and Wis. Stat. ch. 79 "Of Divorce" were subsequently relocated to Wis. Stat. ch. 109 and Wis. Stat. ch. 111 of the 1858 Revised Statutes, respectively. Later, these same provisions were moved again in the Revised Statutes of 1878; "Of Marriage" was assigned Wis. Stat. ch. 107 and "Of Divorce" was assigned Wis. Stat. ch. 109.

have been married to another woman); if so, "then she was incapable of entering into the marriage contract with" her second husband.  Williams, 63 Wis. at 58–59 (statement of the case), 61 (citing Wis. Stat. ch. 107, § 2330; ch. 109, § 2349 (1878)) (stating that no marriage shall be contracted while either of the parties has a husband or wife living, and if still solemnized it shall be "absolutely void").

¶47 This court held that the marriage between the plaintiff and her first husband was invalid because the first husband was still married to his first wife.  Id. at 68. Looking to the divorce statutes in Wis. Stat. ch. 109, the court explained when actions for divorce or annulment are appropriate:

> When the action is for a divorce for any of the causes named in the statutes, it is necessarily upon the assumption that there has been a valid marriage, or one binding, at least, until adjudged void.  But when the validity of the marriage itself is to be determined, then the action should be to affirm or to annul the marriage, and the judgment of affirmance or nullity therein is made by statute "conclusive upon all persons concerned."

Id. at 75 (citing Wis. Stat. ch. 109, §§ 2348, 2350–2352 (1878)).   While seeming to conclude that annulment was the method to void an invalid marriage, the court also said:

> The marriage between the plaintiff and [her first husband] being absolutely void ab initio, it was good for no legal purpose, and its invalidity may be maintained in any proceeding in any court between any parties, whether in the life-time or after the death of the supposed husband or wife, or both, and whether the question arises directly or collaterally.  It is otherwise where the marriage is voidable merely.

21

Id. at 69 (emphasis added) (citations omitted). Williams cited two treatises in support of this proposition. Id. (citing 1 Joel Prentiss Bishop, Commentaries on the Law of Marriage and Divorce, with the Evidence, Practice, Pleading, and Forms; Also of Separations Without Divorce, and of the Evidence of Marriage in All Issues § 105 (6th ed. 1881) [hereinafter Bishop]; 2 Simon Greenleaf, A Treatise on the Law of Evidence § 464 (10th ed. 1868)). Bishop cited numerous state and federal cases from the early to mid-1800s that involved questions about the validity of marriage during either the lifetime or after the death of the parties to a marriage. Bishop, supra, at § 105 n.2.

¶48 Thus, the Williams court concluded that a void marriage, whatever the mechanism or process for challenging the validity of the marriage, may be challenged in the lifetime or after the death of the marriage parties, directly or collaterally. See Williams, 63 Wis. at 69.

¶49 This court interpreted the revised marriage statutes[16] again in Lyannes v. Lyannes, 171 Wis. 381, 177 N.W. 683 (1920),

---

[16] In 1909 the legislature enacted several changes to the marriage statutes relevant to this appeal. Wisconsin Stat. ch. 107 "Of Marriage" kept the same restrictions on who may marry: no one with a husband or wife still living, nor between parties nearer of kin than first cousins, and no one with mental incapacity. § 2, ch. 323, Laws of 1909. However, Wis. Stat. ch. 109 "Of Divorce" contained a new Section 2351 listing the grounds upon which a marriage may be annulled: impotence; consanguinity; when either party had a husband or wife still living; fraud, force, or coercion; insanity or "want of understanding"; and non-age of either party. § 8, ch. 323, Laws of 1909. Thus, the legislature placed limits on when an annulment action could be brought.

22

a case involving two Wisconsin residents who married in Michigan, although one party was underage and neither party obtained consent of parents.  Id. at 382-83 (statement of the case).  The plaintiff brought an action to annul the marriage and to declare it void.  Id. at 383.

¶50 The Lyannes court noted that "public policy has consistently and continuously recognized substantially three different classes" of marriage or claims of marriage: valid, void, and voidable.  Id. at 389-90.

¶51 Lyannes concluded that in the valid marriage the parties are competent to contract and have complied with statutory requirements.  Id. at 389.

¶52 In the void marriage, the parties, "by reason of some positive inhibition of the law, are absolutely disabled and prohibited from sustaining to each other the lawful relationship of husband and wife."  Id.  Lyannes held that a void marriage is "an absolute nullity from its very beginning and cannot be ratified."  Id. at 390.

¶53 Finally, Lyannes addressed the voidable marriage, which "may subsequently ripen into an absolute marriage, and is

---

Further changes were made to the marriage statutes in 1917. Twenty-seven new sections were added to Wis. Stat. ch. 107 on "Marriage," including Section 2339n——21., which was entitled "Unlawful marriages void; validation."  § 3, ch. 218, Laws of 1917.  This section held that all marriages contracted in violation of Section 2339n——1. (valid marriages must be licensed, performed by an authorized celebrant, and in the presence of two competent witnesses) shall be "null and void," but that the parties could validate the marriage later by complying with the statutory requirements.  Id.

23

considered valid and subsisting until annulled by judgment of a court of competent jurisdiction." Id. at 391. The Lyannes court admitted that the distinction between void and voidable marriages is "often shadowy and the line hard to place," with both forms "intermingled" in Wis. Stat. ch. 107's prohibitions on marriage and Wis. Stat. ch. 109's causes for which marriages may be annulled. Id. In either case, however, Lyannes held that the 1909 statutory changes made annulment "the proper remedy to set aside both the void and the voidable marriage." Id. at 392.

¶54 However, the Lyannes court retained language similar to the Williams decision more than three decades earlier:

> In the void marriage the relationship of the parties, so far as its being legal is concerned, is an absolute nullity from its very beginning and cannot be ratified. It may be questioned at any time during the life of both, and, with some statutory exceptions[17] . . . , after the death of either or

---

[17] The exception that the Lyannes court cites was Wis. Stat. § ch. 109, § 2351(2) (1919). Lyannes v. Lyannes, 171 Wis. 381, 390, 177 N.W. 683 (1920). Section 2351 listed the causes for annulment, including consanguinity ("where the parties are nearer of kin than second cousins") in subsection (2). However, subsection (2) also directed that "when any such marriage shall not have been annulled during the lifetime of the parties, the validity thereof shall not be inquired into after the death of either party."

24

> both, and generally whether the question arises
> directly or collaterally. As between the two
> individuals concerned no rights spring therefrom, and,
> generally speaking, except as modified by positive
> legislation, it needs no adjudication by a court that
> it is void. That such is the law of this state has
> been repeatedly held.

Id. at 390 (emphasis added) (citations omitted). Therefore, the
Lyannes court continued to recognize the ability of a court to
invalidate a marriage after death.[18]

¶55 Sixteen years later, in the estate case of King v.
Canon, 221 Wis. 322, 266 N.W. 918 (1936), the validity of a
deceased woman's marriage was questioned because she was an

---

This additional language prohibiting posthumous inquiry
into a particular cause for annulment is noteworthy. Here, the
legislature unambiguously prohibited the questioning of a
marriage's validity, based on consanguinity, after one of the
parties died; by contrast, no such prohibition appears with
respect to mental incapacity of a party. The legislature's
break with the common law could not have been clearer,
illustrating that when the legislature wants to contravene the
common law it does so clearly and unambiguously. See infra,
¶76.

[18] In 1925 the marriage and divorce statutes were
renumbered. Wisconsin Stat. ch. 107 on "Marriage" was
renumbered as Wis. Stat. ch. 245, and Wis. Stat. ch. 109, now
titled simply "Divorce," was renumbered as Wis. Stat. ch. 247.
§ 1, ch. 4, Laws of 1925.

In the 1979-80 legislative session, Wis. Stat. ch. 245 on
"Marriage" was renumbered Wis. Stat. ch. 765. § 48, ch. 32,
Laws of 1979. Wisconsin Stat. ch. 247 on "Actions Affecting
Marriage" was renumbered Wis. Stat. ch. 767, § 50, ch. 32, Laws
of 1979, and the title was changed to "Actions Affecting the
Family." Chapter 32, Laws of 1979 (emphasis added).

25

epileptic and incapable of contracting marriage in this state.[19] Id. at 323-25.  The question before this court was whether the marriage of the decedent——originally contracted in Illinois but contrary to the existing laws of this state——was void.  Id. at 324.  The King court concluded that, because Chapter 218, Laws of 1917 prohibited epileptics from contracting marriage, Canon's marriage was void.  Id. at 327.  Quoting Lyannes, the King court reiterated that void marriages may be questioned after the death of the parties.  Id. at 328 (quoting Lyannes, 171 Wis. at 390).

¶56  Once again, in Davidson v. Davidson, 35 Wis. 2d 401, 151 N.W.2d 53 (1967), this court had occasion to interpret the marriage statutes in an action for annulment brought by a wife who alleged that her husband was still married to another woman at the time of the marriage ceremony.  Id. at 403 (statement of the case).  However, the wife died before the annulment action was brought to trial.  Id. at 404.  The circuit court denied the application of the wife's estate to continue the annulment action.  Id.

¶57  According to the Davidson court, the issue of whether to allow the annulment action to continue depended upon whether the marriage was void or voidable:

> If the marriage was voidable it was valid and in
> effect at the time of [the second wife]'s death and
> the personal cause of action for annulment abated at

---

[19] Wisconsin Stat. § 245.03(1) (1925), in effect at the time of the marriage at issue in the case, stated that, "[n]o insane person, epileptic, or idiot shall be capable of contracting marriage."

26

the time of her death. If the marriage was void during its entirety the cause of action survives in her estate and the court could retain jurisdiction to declare the marriage void and restore her property to the estate.

Id. at 406 (emphasis added) (footnote omitted). The Davidson court looked to Lyannes' definitions of void and voidable, id. at 406-07, but also focused on another set of definitions:

> [A] marriage may be considered voidable although prohibited by law when it is possible, under any circumstances, for the parties to contract the marriage, or subsequently to ratify it, while it should be considered void if it is impossible for them under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, and if the statute expressly declares that the marriage is void.

Id. at 407 (emphasis added) (internal quotation marks and citation omitted).

¶58 Other more modern cases continued to recognize a common law right to post-death challenges to the validity of a marriage. See, e.g., Corning v. Carriers Ins. Co., 88 Wis. 2d 17, 21, 276 N.W.2d 310 (1979); Estate of Gibson v. Madison Bank & Trust Co., 7 Wis. 2d 506, 96 N.W.2d 859 (1959).

¶59 The central holding of Estate of Toutant——that a court can declare a marriage void after the death of one of the parties——comports with persuasive authority on the topic. An American Law Reports article discusses general attacks on marriages after the death of a party:

> The later cases, as do the earlier ones, amply show that, except as statutes occasionally otherwise provide, the question whether the validity of a marriage is open to attack in a judicial proceeding subsequently to the death of a party to the marriage

27

> ordinarily resolves itself into the inquiry whether the marriage is in the true sense void, or, on the contrary, voidable only.
>
> If the marriage is void, the fact of nullity may be shown, directly or collaterally, after the death of either or both of the parties.

Annotation, Right to Attack Validity of Marriage After Death of Party Thereto, 47 A.L.R.2d 1393, 1394 (1956). The article then specifically discusses marriages that are challenged due to the mental incompetency of a party:

> The later cases show that the rule of the common law, and the one which ordinarily prevails in the absence of contrary statutory provision or implication, is that the marriage of a person who was insane or otherwise mentally incompetent to enter into the marriage, is void, and consequently open to attack after the death of either or both of the parties.

Id. at 1396. American Jurisprudence also discusses the consequences of void marriages specifically:

> As a rule, a void marriage, as distinguished from one that is merely voidable, is null from its inception, that is, when a marriage is void, it is for most purposes, as if no marriage had taken place. Under this view, a void marriage is good for no legal purpose, and is not attended or followed by any of the incidents of a valid marriage. It can be attacked either directly or collaterally, and in fact, a marriage void ab initio is subject to collateral attack at any time whereas a marriage merely voidable cannot be annulled after the death of either spouse.

52 Am. Jur. 2d Marriage § 82 (2011) (emphasis added) (footnotes omitted). See also 55 C.J.S. Marriage § 43 (2009) (describing a void marriage as a nullity, "subject to both direct and

28

collateral attack, . . . at any time," including after the death of either or both parties).[20]

¶60  Therefore, the holding in Estate of Toutant is based on the common law principle that, in either direct or collateral proceedings, a marriage may be declared void after the death of one of the parties.  Our case law has always followed this common law principle.

### C. What is a Void Marriage?

¶61  As noted earlier, Davidson provided a comprehensive definition of a void marriage: "if it is impossible for [the parties] under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, and if the statute expressly declares that the marriage is void." Davidson, 35 Wis. 2d at 407 (internal quotation marks omitted).

¶62  Wisconsin Stat. ch. 765 sets out the criteria for who may contract a marriage and who shall not marry.  Wisconsin Stat. § 765.21 provides that "[a]ll marriages hereafter contracted in violation of ss. 765.02, 765.03, 765.04 and 765.16 shall be void, except as provided in ss. 765.22 and 765.23."

¶63  Wisconsin Stat. § 765.01 requires that an individual be "capable in law of contracting" to marry in this state.  See also Wis. Stat. § 765.02(1) ("Every person who has attained the

---

[20] The article in 55 C.J.S. Marriage § 43 describes a void marriage as a nullity, "subject to both direct and collateral attack, by anyone, at any time . . . ." (Emphasis added.)  The phrase "by anyone" makes the proposition too broad.  To attack the validity of a marriage, a person must have standing to raise the issue.

age of 18 years may marry if otherwise competent."); Wis. Stat. § 765.03 ("A marriage may not be contracted if either party has such want of understanding as renders him or her incapable of assenting to marriage."); Wis. Stat. § 765.21 (a marriage is void if it is contracted contrary to certain provisions in Wis. Stat. ch. 765).

¶64 The death of an incompetent party to an alleged marriage makes it impossible for the parties to ratify the marriage if the party remains incompetent from the time of the marriage until death.  More specifically, if a party to an alleged marriage is incompetent at the time of a marriage ceremony and subsequently dies before he or she is able to ratify the marriage, the fatal defect to the marriage can never be cured.

D. The UDJA is the Proper Mechanism to Declare a Marriage Void

¶65 As explained in Estate of Toutant, Wis. Stat. § 806.04, the UDJA is the mechanism for voiding a marriage when one of the parties to the marriage is dead.  See Estate of Toutant, 247 Wis. 2d 400, ¶¶12-14.

¶66 Wisconsin Stat. § 806.04, the UDJA, reads, in relevant part:

> (1) Scope.  Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.  No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for.  The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree,

30

except that finality for purposes of filing an appeal as of right shall be determined in accordance with s. 808.03 (1).

. . . .

(4) Representatives, etc. Any person interested as or through a personal representative, trustee, guardian, or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust in the administration of a trust, or of the estate of a decedent, infant, individual adjudicated incompetent, or insolvent, may have a declaration of rights or legal relations in respect to the administration of the trust or estate . . . .

(5) Enumeration not exclusive. The enumeration in subs. (2), (3) and (4) does not limit or restrict the exercise of the general powers conferred in sub. (1) in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty.

Wis. Stat. § 806.04(1), (4), (5).[21]

¶67 A declaratory judgment is a "binding adjudication that establishes the rights and other legal relations of the parties without providing for or ordering enforcement." Black's Law Dictionary 918 (9th ed. 2009). Declaratory relief may be obtained in the following circumstances:

(1) There must exist a justiciable controversy——that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it.

---

[21] The declaratory judgment statute has often been used in cases involving the status of marriages. Cf. Georgiades v. Di Ferrante, 871 S.W.2d 878 (Tex. App. 1994) (determination of whether common law marriage existed between parties); Henry v. Henry, 106 N.W.2d 570 (Mich. 1960) (wife's challenge to whether husband's Nevada divorce was valid).

31

(2) The controversy must be between persons whose interests are adverse.

(3) The party seeking declaratory relief must have a legal interest in the controversy——that is to say, a legally protect[a]ble interest.

(4) The issue involved in the controversy must be ripe for judicial determination.

Loy v. Bunderson, 107 Wis. 2d 400, 409, 320 N.W.2d 175 (1982) (quoting State ex. rel. La Follette v. Dammann, 220 Wis. 17, 22, 264 N.W. 627 (1936) (internal quotation marks omitted)).  An action under the UDJA can be brought either directly or collaterally, in estate actions, in contract actions, and in actions construing statutes or ordinances.  See Wis. Stat. § 806.04; see also Bucca v. State, 128 A.2d 506 (N.J. Super. Ct. Ch. Div. 1957) (petition brought under UDJA to validate marriage while both were parties still alive); In re O'Quinn, 355 S.W.3d 857 (Tex. App. 2011) (UDJA used in an estate action that inter alia decided the validity of a marriage); State ex rel. Joyce v. Farr, 236 Wis. 323, 295 N.W. 21 (1940) (motion for declaratory judgment in estate action); Miller v. Currie, 208 Wis. 199, 242 N.W. 570 (1932); Shovers v. Shovers, 2006 WI App 108, 292 Wis. 2d 531, 718 N.W.2d 130; Estate of Lonquest v. Jones, 526 P.2d 994 (Wyo. 1974) (UDJA used for determination of heirship).

¶68 The Corning case provides a good illustration of why declaratory judgment authority to review a marriage after the death of one of the parties is necessary.  James Corning died from injuries suffered when a truck insured by Carriers collided with the truck operated by him.  Corning, 88 Wis. 2d at 19.  The wrongful death case was settled for $200,000, contingent upon

32

Colleen Corning establishing that she was the decedent's wife (the two were married in Illinois less than a year after Colleen's divorce in her first marriage). Id. at 19-20. The court ruled in favor of Colleen, but it observed: "A wrongful death action is not an action to affirm or annul a marriage. We believe that Carriers does have the right to assert the defense that Colleen Corning is not the spouse of James Corning." Id. at 21.

¶69 As Estate of Toutant affirmed, Wis. Stat. ch. 765 establishes the legal basis for invalidating a marriage, whereas the UDJA provides the mechanism for doing so when an interested party is not able to seek an annulment.

### E. 2005 Changes to the Annulment Statute Did Not Disturb the Holding of Estate of Toutant

¶70 McLeod argues that even if Williams, Lyannes, and a long line of our cases, including most recently Estate of Toutant, retained the common law rule that allowed a court to invalidate a marriage after death, the changes to Wis. Stat. ch. 767 by 2005 Wis. Act 443 left no doubt that the legislature abrogated this rule and that annulment is the only way to invalidate a marriage. We disagree.

¶71 At the time the court of appeals decided Estate of Toutant, the annulment statute, then-Wis. Stat. § 767.03, read in part: "No marriage may be annulled or held void except

33

pursuant to judicial proceedings.  No marriage may be annulled after the death of either party to the marriage."[22]

¶72  In 2005 the Wisconsin Legislative Council's Special Committee on Recodification of Ch. 767, Stats., Actions Affecting the Family (the Special Committee), recommended legislation to reorganize and revise the chapter.[23]  Wis. Legis. Council Rep. to the Leg., Spec. Comm. on Recodification of Ch. 767, Stats., Actions Affecting the Family, at 5 (April 11, 2005).  One of the changes suggested by the Special Committee, and adopted into law, removed any reference in the annulment statute to a judicial proceeding being used to "void" a marriage.  2005 Wis. Act 443, §§ 23, 145.  Thus, the current annulment statute, Wis. Stat. § 767.313(2) reads in pertinent

---

[22] The precise language relating to judicial proceedings has been in the statutes since 1959.  § 44, ch. 595, Laws of 1959. The language on death of the parties was added in 1977.  § 9, ch. 105, Laws of 1977.

[23] The report by the Special Committee, in making its report to the Wisconsin Joint Legislative Council for introducing legislation in the 2005-06 session, explained the charge to the Special Committee as follows:

> The committee was directed to conduct a recodification of ch. 767, Stats., including possibly reorganizing the chapter in a logical manner, renumbering and retitling sections, consolidating related provisions, modernizing language, resolving ambiguities in language, codifying court decisions and making minor substantive changes.

Wis. Legis. Council Rep. to the Leg., Spec. Comm. on Recodification of Ch. 767, Stats., Actions Affecting the Family, at 5 (April 11, 2005).

part: "A judicial proceeding is required to annul a marriage.  A marriage may not be annulled after the death of a party to the marriage."

¶73  2005 Wisconsin Act 443 contained an explanatory note after the language amending the annulment statute to eliminate the words "or held void."  The note read: "Reference to voiding a marriage is not included in the restated language because [Wis.  Stat.] ch.  767 does not include actions to void a marriage."  2005 Wis. Act 443, § 145.

¶74  The explanatory note to the new Wis.  Stat. § 767.313(2) in 2005 Wis.  Act 443 means exactly what it says: Chapter 767, on "Actions Affecting the Family," does not contain an action to void a marriage.  Wis. Stat. § 767.001(1).  The action to void a marriage comes through Wis. Stat. ch. 765 on "Marriage."  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Kalal, 271 Wis. 2d 633, ¶39 (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) (internal quotation marks omitted)).

¶75  Drafting records for 2005 Wis. Act 443 do not indicate that the legislature intended for annulment to be the only remedy to invalidate a marriage.  In a preliminary bill draft for the Special Committee, a bill drafter asked, "Is it necessary to continue reference to voiding a marriage (ch. 767 does not cover actions to void a marriage)?"  Preliminary Draft, WLC:0004/P1, Spec. Comm. on Recodification of Ch. 767, Stats.,

Actions Affecting the Family, Wis. Leg. Council, Madison, Wis. (Oct. 15, 2002).[24]

¶76  We also observe that the Special Committee incorporated explanatory notes into the body of draft legislation, in part to "[i]dentify the source of the recodified law (i.e., previous law, court decision, decision by the Special Committee) and, if previous law, the previous location of the provisions."  Memorandum from Don Dyke, senior staff attorney, Wis. Leg. Council to Members of the Spec. Comm. on Recodification of Ch. 767, Stats., Actions Affecting the Family (Sept. 20, 2002) (available at Wis. Leg. Council, Madison, Wis.).  The removal of "or held void" in 2005 Wis. Act 443, § 145, and in earlier bill drafts, was accompanied by an explanatory note that did not reference the Estate of Toutant decision.  Thus, we are not persuaded that this change by the Special Committee came in response to Estate of Toutant. Compare 2005 Wis. Act 443, § 145, Note, with 2005 Wis. Act. 443, § 166, Note (citing Racine Family Court Comm'r v. M.E. and S.A., 165 Wis. 2d 530, 478 N.W.2d 21 (Ct. App. 1991)).

¶77  If the legislature had wanted to eliminate this common law remedy, then it would have done so in clear, unambiguous

---

[24] The "question" whether to retain the reference to the act of voiding in Wis. Stat. ch. 767 was entirely appropriate inasmuch as the revision of the chapter involved efforts to remove unnecessary language.  Wisconsin Stat. § 767.001(1) defines "[a]ction affecting the family" to include affirmance of marriage, annulment, divorce, and legal separation, but does not list voiding a marriage.  Reference to voiding is only in Wis. Stat. ch. 765.

language.    See, e.g., Schmidt v. N. States Power Co., 2007 WI 136, ¶67, 305 Wis. 2d 538, 742 N.W.2d 294; Aslakson v. Gallagher Bassett Servs., 2007 WI 39, ¶82 n.34, 300 Wis. 2d 92, 729 N.W.2d 712; Fuchsgruber v. Custom Accessories, Inc., 2001 WI 81, ¶25, 244 Wis. 2d 758, 628 N.W.2d 833.    See also John P. Foley, Comment, The Voidable Void Marriage in Wisconsin, 49 Marq. L. Rev. 751, 752 (1966) (asserting that annulment "applies only to a direct attack upon the status of marriage" and that marriage "may also be attacked collaterally and the court can declare the marriage void when rights incident to marriage are in question").    If this common law principle were indeed abrogated, it would adversely affect the UDJA and cases maintaining the common law right to post-death challenges to the validity of a marriage.  See supra, ¶58.

¶78 Finally, allowing a court to invalidate a marriage after the death of one of the parties to a void marriage accords with public policy and legislative intent on marriage.    The declared intent of the legislature in Wis. Stat. chs. 765 to 768 is "to promote the stability and best interests of marriage and the family."  Wis. Stat. § 765.001(2).  We do not see how the "best interests of marriage" are protected where legitimate questions about a spouse's capacity to contract marriage are precluded from consideration after the spouse dies.

¶79  McLeod argues that a decedent's family has no recourse to question the validity of marriage after a party to the marriage dies.    That rule would apply not only to cases commenced after the spouse dies but also to annulment actions

37

commenced when the spouse was living but not completed before the spouse dies.  McLeod would have us hold that the legislature intended that an incompetent decedent's estate or an aggrieved party is simply out of luck——that an incomplete annulment action cannot be converted into an action to declare the marriage void. Troubling scenarios can be avoided by an option to declare a marriage void after the death of one of the parties, either directly or in a collateral proceeding.  See Davidson, 35 Wis. 2d at 407.

¶80 Interpreting the changes to the annulment statute as a limitation on courts would drastically curtail a court's power to address fraud, mistake, and other exigencies in a disputed marriage in order to "declare rights, status, and other legal relations."  Limiting a court's power would effectively shut off declaratory remedies for parties in an estate action.

¶81 Once again, the issue in this case is whether a court may consider the validity of a marriage after the death of one of the parties to the marriage.  In holding that a court has this power, we do not take a position on the merits of the present dispute.  On remand, the marriage between Laubenheimer and McLeod will be presumed valid, and the objectors will have the burden of proving that it is void by clear and convincing evidence.

¶82 We believe that Laubenheimer's capacity to enter into marriage is somewhat analogous to a person's capacity to make or revoke a will.  Wis. Stat. § 853.01.  "Generally, a person competent to make a will may give or devise his property as he

38

wishes within the public policy of the state." Farrell v. Nw. Loan & Trust Co., 199 Wis. 273, 278, 226 N.W. 306 (1929). On remand, the circuit court will have the responsibility of weighing the evidence to determine whether Laubenheimer had the capacity to enter into marriage at the time of the marriage ceremony. Will contest cases such as Schultz v. Lena, 15 Wis. 2d 226, 112 N.W.2d 591 (1961); Brandon v. Hagen, 264 Wis. 269, 58 N.W.2d 636 (1953); and Smits v. Valley, 202 Wis. 434, 232 N.W. 845 (1930), may provide the court with some assistance.

## IV. CONCLUSION

¶83 In Estate of Toutant, the court of appeals held that there is a fundamental distinction between annulment and a judicial declaration that a marriage is void. The court of appeals further held that in an estate action challenging a marriage, a court may use its declaratory judgment powers to declare that a marriage prohibited by law was void and incapable of validation by the parties to the marriage.

¶84 We conclude that the holdings and analysis in Estate of Toutant are correct. Annulment is certainly an appropriate remedy to void a marriage when the parties to the marriage are still alive, but it is not the exclusive remedy to challenge the validity of a marriage. The common law drew a distinction between an annulment and a declaration that a marriage was void, especially a declaration after the death of one of the parties. Our statutes and case law have preserved that distinction.

39

¶85  Wisconsin Stat. ch. 765 sets out the criteria for a valid marriage in this state.  Failure to meet one of these criteria often results in a void marriage.  An action under the UDJA is the established mechanism for testing the validity of a marriage in an estate case because the UDJA explicitly provides standing for interested parties in an estate action.

¶86  The change in the annulment statute in 2005 Wis. Act 443 did not alter the holdings in the Estate of Toutant case. There is no evidence that the legislature sought to curtail a court's power to address fraud, mistake, and other exigencies in a disputed marriage in order to "declare rights, status, and other legal relations."  Wis. Stat. § 806.04(1).  Limiting a court's power to address these issues would effectively shut off declaratory remedies for parties in an estate action.

¶87  We remand the case to the circuit court for further action consistent with this opinion.


By the Court.—The order of the circuit court is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶88 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting).* I write separately because I adopt neither the majority opinion nor Justice Gableman's dissenting opinion, and I urge the legislature to consider taking action. In Wisconsin, statutes not common law, govern marriage, divorce, and annulment. Because the issues raised in this case are not clearly addressed in the statutes, the legislature should consider the policy reasons that militate in favor of and against the positions taken by the majority opinion and by Justice Gableman's dissent. In sum, I dissent because while case law may support a court's ability to void, as a matter of law, a marriage that is invalid <u>ab initio</u>, neither case law nor statutes support a court taking such action under the facts of this case.

¶89 The majority opinion concludes that the circuit court <u>always</u> has the ability to declare a marriage void after the death of one of the parties to the marriage. <u>See</u> majority op., ¶¶83-84. I part ways with the majority's sweeping opinion, under which any interested person may bring a declaratory action to void another person's marriage. The majority's policy reason is as follows: "We do not see how the 'best interests of marriage' are protected where legitimate questions about a spouse's capacity to contract marriage are precluded from consideration after the spouse dies." <u>See</u> majority op., ¶78 (quoting Wis. Stat. § 765.001(2)). The majority opinion however, is not cabined, as was previous case law, to an uncontroverted paper review of a marriage that was void <u>ab</u>

1

initio. See infra, ¶93. The majority does not seem concerned with any limitations on such an action, nor does it lament that a decedent would never be able to defend his or her decision to marry. Notably, even an individual who has been declared legally incompetent and in need of a guardian may retain the capacity to marry. See Wis. Stat. §§ 54.25(2)(c)1.a., 51.59(1) (2009-10).[1] While the majority does opine that a marriage is presumed valid, it does not set forth the burden of proof that the challenger must meet, nor does it sufficiently address the practical evidentiary concerns raised by the circuit court. See majority op., ¶¶81-82; infra, ¶95.

¶90 On the other hand, I part ways with Justice Gableman's sweeping dissent, which concludes that a court can never void a marriage, even a marriage that is undisputedly void ab initio. See Gableman dissent, ¶98. Justice Gableman concludes that the legislature has made a public policy determination by not providing for a court to posthumously void a marriage. Id., ¶123. Under Justice Gableman's approach, I find it troubling that a court would be powerless to posthumously void an undisputedly invalid marriage and that those who are rightfully entitled to receive the decedent's estate would be left with no recourse, even if the marriage was undisputedly void ab initio.

¶91 Different, yet reasonable, considerations support the conclusions reached by either the majority opinion or Justice Gableman's dissent. As a matter of policy, the legislature

---

[1] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

2

could reasonably conclude that a court is endowed with the power to posthumously void a marriage always, sometimes, or never.

¶92 I dissent because no statute clearly provides a circuit court with the authority to posthumously void a marriage in a probate matter under the circumstances of this case. In Wisconsin, marriage, divorce, and annulment are governed by statute. See Wis. Stat. ch. 765; Watts v. Watts, 137 Wis. 2d 506, 519 n.11, 405 N.W.2d 303 (1987) (noting that there is no common law marriage in Wisconsin); see Gableman dissent, ¶110 (criticizing the majority opinion for relying on a common law action to void a marriage when marriage, divorce, and annulment are all governed by statute). No statute under Wis. Stat. chs. 765 (marriage), 767 (actions affecting the family), or 851-82 (probate), specifically provides the circuit court with the power to void a marriage posthumously. The statutes are clear, however, that a court may not annul a marriage after the death of one of the parties to the marriage. Wis. Stat. § 767.313(2).

¶93 Case law may provide the court with the power to void a marriage after the death of one of the parties when the marriage is undisputedly void ab initio. The majority relies heavily on that case law and common law principles to conclude that the circuit court has the power to posthumously void a marriage.[2] However, as Justice Gableman's dissent discusses,

---

[2] The circuit court distinguished this case from Davidson v. Davidson, 35 Wis. 2d 401, 151 N.W.2d 53 (1967), and Ellis v. Estate of Toutant, 2001 WI App 181, 247 Wis. 2d 400, 633 N.W.2d 692, based on the uncontested evidence that the marriages were void:

3

subsequent legislative action arguably undermines the precedential value of those cases.[3] See Gableman dissent, ¶111. In addition, the facts of those cases are distinguishable from the facts of the case at issue. For example, in Toutant, the decedent Toutant had married Ellis within 30 days of Ellis's

---

The arguments of those parties seeking to void the marriage in both Davidson and Toutant were based on uncontested factual realities. In Davidson, it was uncontested that Robert was still married to his first wife Mildred, at the time his marriage to Leona was solemnized on March 12, 1956. In Toutant, it was uncontested that Marjorie and John were married only 30 days following his Scottish divorce. Those uncontested factual realities served as the basis of the argument that each of the respective marriages was contrary to Wisconsin law. . . . The proponents of invalidating [Nancy's] marriage need to prove that, in fact, the decedent was incompetent at the time of her marriage to Mr. McLeod. That is not a given. That is not undisputed.

[3] The precedential value of those cases is questionable because the legislature changed a key provision of Wis. Stat. § 767.313 since those cases were decided. See majority op., ¶¶70-73. At the time Toutant was decided, then-Wis. Stat. § 767.03 (1999-2000) read "No marriage may be annulled or held void except pursuant to judicial proceedings. No marriage may be annulled after the death of either party to the marriage." (Emphasis added.) In 2005, the legislature amended that language to remove the reference to a judicial proceeding to "void" a marriage. 2005 Wis. Act 443, § 145. A legislative note to that Wisconsin Act states: "Reference to voiding a marriage is not included in the restated language because [Wis. Stat.] ch. 767 does not include actions to void a marriage." That note can be read in two ways. First, the note can be read to state that the legislature was responding to Toutant and removing the court's ability to "void" a marriage, leaving annulment and divorce as the only proceedings to terminate a marriage. Second, the legislature could have been removing the reference to voiding a marriage within ch. 767 (actions affecting the family), because that action properly belongs in ch. 765 (marriage) or is a product of common law.

4

divorce from a prior spouse. Ellis v. Estate of Toutant, 2001 WI App 181, ¶6, 247 Wis. 2d 400, 633 N.W.2d 692. In Wisconsin, a person is prohibited from marrying again within six months of a divorce. Wis. Stat. § 765.03(2). Similarly, in Williams and Davidson, the marriages were challenged because, in both cases, one of the parties to the marriage was alleged to have been married at the time the challenged marriage took place. Williams v. Williams, 63 Wis. 58, 23 N.W. 110 (1885); Davidson v. Davidson, 35 Wis. 2d 401, 151 N.W.2d 53 (1967). The statutes clearly prohibit a person from being marriage to two people at the same time. See Wis. Stat. § 765.03; Davidson, 35 Wis. 2d at 407; majority op., ¶44. Similarly, in King v. Canon, 221 Wis. 322, 266 N.W. 918 (1936), the validity of a decedent's marriage was challenged because the decedent was an epileptic. However, at that time, a statute prohibited an epileptic from marrying. Id. at 325; majority op., ¶55. Thus, in these cases, a court could conclusively determine that the challenged marriage was void based upon the documentation alone.

¶94 Significantly, to the extent that these cases support the circuit court's ability to void a marriage after death, in each case, unlike the case at issue, the contested marriage was undisputedly void ab initio. Cf. State v. Hess, 2010 WI 82, ¶¶71-73, 327 Wis. 2d 524, 785 N.W.2d 568 (Ziegler, J., concurring) (discussing a warrant that was void ab initio, as the circuit court lacked the authority to issue the challenged warrant). In other words, as a matter of law, the contested marriage was undisputedly invalid from inception. See Lyannes

v. Lyannes, 171 Wis. 381, 177 N.W. 683 (1920) (discussing void and voidable marriages); majority op., ¶¶52-53. In such actions, for example, the party challenging the marriage simply submitted documentary evidence to prove that the marriage was void, and the court could determine the validity of the challenged marriage from the documents alone. The evidentiary concerns raised by the circuit court in the case at issue, see infra, ¶95, are not of concern in such uncontroverted matters.

¶95 In this case, however, Patricia Mudlaff argued that her stepmother Nancy Laubenheimer's marriage to Joseph McLeod was invalid because Nancy lacked the mental capacity to enter into the marriage. To determine whether Nancy was competent to marry Joseph, the court would presumably need to hear evidence such as examinations and testimony from doctors on Nancy's mental state at the time she married Joseph. As the circuit court recognized, that is a difficult task given Nancy's death:

> [I]f this Court is wrong in its determination that a court cannot invalidate [Nancy's] marriage, this Court will need great assistance from the reviewing court in determining what sort of evidence can be raised at this point in time to challenge [Nancy's] competency. Issues such as privilege, hearsay, the 'dead man's statute' and other relevancy concerns all come in to question where the potential 'ward' is deceased. Additionally, great prejudice could result if a party seeking a determination [of] incompetency (and lack of right to consent to marriage) was able to have mom (or step-mom) examined by a doctor of [his or her] choosing prior to her death, whereas those opposed to the incompetency finding have not. The equities of that scenario are highly questionable.

I would affirm the circuit court's reasoning. Since the case law is questionable, and the relevant statutory provisions do

not clearly provide that a court has the power in a probate matter to void a marriage posthumously, legislative response to this situation is seemingly appropriate.

¶96 Strong policy concerns and equities militate both in favor of and against allowing a court to void a marriage after death.  To the extent that the legislature deems it appropriate to endow courts with the authority to void marriage under certain circumstances, it should clarify the court's power to so act.  Current statutes and case law do not clearly empower a court with the ability to void a marriage after the death of one of the parties to the marriage.  As marriage, divorce, and annulment are all governed by statute, the legislature should likewise consider when, if ever, a marriage may be deemed void after the death of one of the parties to the marriage.

¶97  For the foregoing reasons, I respectfully dissent.

¶98 MICHAEL J. GABLEMAN, J. *(dissenting).* There is great confusion in this area of Wisconsin law, and there has been for many years. The majority makes a valiant effort to clarify it, exhaustively and eloquently summarizing the statutory and jurisprudential developments that have brought us to the present quandary. Unfortunately, though, the court's ultimate resolution of the question presented codifies a legal misunderstanding that has been germinating for decades and now bursts into full bloom. Although the issue we take up here is not an easy one, it can and should be disposed of on the basis of a simple proposition: annulment is the only process for invalidating a marriage other than divorce, as per the legislature's wishes, and that process cannot be undertaken after the death of a spouse. It was the legislature's prerogative to limit the remedies available to parties challenging marriages, and it is not our place to expand them beyond their statutory confines. Because the majority holds otherwise, I respectfully dissent.

## I. DISCUSSION

¶99 The majority cobbles together a variety of statutory and common-law sources in its mission to prove the existence of a posthumous means to invalidate marriage outside of annulment.

I take up each source in turn and demonstrate why it does not substantiate the asserted power.[1]

A. THE ANNULMENT STATUTE DOES NOT SUPPORT THE ASSERTED POWER

¶100 The majority does not claim that Wis. Stat. § 767.313 (2009-10),[2] the annulment statute, establishes the power to nullify a marriage after death. Nevertheless, it is worth beginning with the provision's history. For that history not only provides no support for such a power, it actually conclusively proves that none exists.

¶101 There is no need to set forth all the various and sundry changes made to the statute over the decades, as the majority ably does. For present purposes, there are only two salient features to its evolution. First, in 1909 the legislature began listing grounds for annulment, including incompetence. Majority op., ¶49 n.16. At the same time, it started to "place[] limits on when an annulment action could be brought," id., most significantly barring the posthumous annulment of a marriage between cousins. Wis. Stat. ch. 109, § 2351(2) (1909). In the ensuing years it continued that process and, in 1977, imposed the most important limitation with

---

[1] I agree with the majority's conclusion that the incompetence of a spouse renders a marriage void, not voidable. See majority op., ¶¶61-64. That common ground does not alter the bottom line, however, because annulment is the exclusive mechanism for invalidating any marriage, void or voidable, Falk v. Falk, 158 Wis. 2d 184, 189, 462 N.W.2d 547 (Ct. App. 1990), and for the reasons set forth below annulment cannot be utilized after death.

[2] All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

2

respect to this dispute, pronouncing that <u>any</u> annulment, regardless of the grounds for the action, could no longer be obtained after the death of either of the spouses. Majority op., ¶71 n.22.

¶102 The second relevant turn of events began in 1959, when the legislature inserted the following emphasized language into the annulment statute: "[n]o marriage shall be annulled <u>or held void</u> except pursuant to judicial proceedings." 1959 Wis. Laws, ch. 595, § 44 (emphasis added). Nearly 50 years later the legislature withdrew those three crucial words. 2005 Wis. Act 443.

¶103 Taken together, these two parallel developments underscore two legislative directives: 1) lawmakers wanted to restrict the circumstances in which marriages could be invalidated, first ruling out posthumous invalidations for <u>some</u> annulments as one of those restrictions, and then ruling out posthumous invalidations altogether; and 2) they wanted, at one point, to acknowledge a route to invalidation other than annulment and then, at a later point, to retract that acknowledgement. Stated differently, the right to a posthumous annulment was taken away, and then the right to have a marriage "held void" was as well. In sum, the majority restores to circuit courts an authority that the legislature eradicated through a hundred years of statutory refinement.

B. WISCONSIN STAT. § 765.03(1) DOES NOT SUPPORT THE ASSERTED POWER

3

¶104 Since the history of the annulment statute is so unhelpful to its cause, the majority focuses far more heavily on another statute: Wis. Stat. § 765.03(1). That section provides that "[a] marriage may not be contracted" in cases of sufficient incompetence. In the majority's view, "[t]he action to void a marriage comes through" § 765.03(1). Majority op., ¶74. This cannot be so. Section 765.03 does not purport to endow courts with the authority to do anything. It is true that the statutes categorize a marriage with an incompetent spouse as "null and void," Wis. Stat. §§ 765.21, 765.002(6), but nowhere, outside of the annulment statute, do they empower courts to invalidate marriages on that ground. The mere fact that a statute makes a statement about the world does not entitle a court to do whatever it likes with that statement. Indeed, the application and enforcement of several of the most important rules in our system of government are entirely outside the province of the judiciary. See, e.g., Luther v. Borden, 48 U.S. 1 (1849) (forbidding the courts, on political question grounds, from considering cases concerning the federal constitution's guarantee of a republican form of government). It is particularly improbable that Wis. Stat. § 765.03 provides courts with a license to enforce its requirements however they like when there is another statute, only a few pages later in the statute book, that is plainly designed as its enforcement mechanism. See State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted . . . in relation to the

4

language of surrounding or closely-related statutes . . . .")
(citations omitted). Wisconsin Stat. § 765.03(1) spells out
grounds to invalidate marriages through the annulment process,
and with the limitations imposed on that process, including the
limitation preventing post-mortem annulments. Cf. Sinai
Samaritan Med. Ctr., Inc. v. McCabe, 197 Wis. 2d 709, 713 n.3,
541 N.W.2d 190 (Ct. App. 1995) (observing that an action to
invalidate a marriage as violative of § 765.03(1) must be filed
under the annulment statute). Wisconsin Stat. § 765.03(1)
provides the majority no succor.

### C. THE DECLARATORY JUDGMENTS ACT DOES NOT SUPPORT THE ASSERTED POWER

¶105 Perhaps sensing that Wis. Stat. § 765.03 cannot
withstand the weight it is asked to carry, the majority turns
also to the Declaratory Judgments Act, Wis. Stat. § 806.04. See
majority op., ¶¶65-69. That statute is not up to the task
either. As an initial matter, it is curious that the court
would place such heavy emphasis on the Act in this of all cases,
given that neither the objectors nor the circuit court ever
relied upon it. The circuit court granted a petition for formal
administration of the estate, not a motion for declaratory
judgment.

¶106 Even if the Declaratory Judgments Act had played a
role below, it should not play a role in our decision. Two of
the most universally accepted canons of statutory construction
compel us, respectively, to favor a more specific statute over a
more general one, see, e.g., Marlowe v. IDS Prop. Cas. Ins. Co.,

5

2013 WI 29, ¶45, 346 Wis. 2d 450, 828 N.W.2d 812, and to give effect to every word the legislature enacted if possible. See, e.g., State v. Koopmans, 210 Wis. 2d 670, ¶14, 563 N.W.2d 528 (1997). Both canons counsel against the majority's approach.

¶107 Wisconsin Stat. 767.313 was written specifically to elucidate the process for obtaining a judicial determination regarding the validity of a marriage. By contrast, the Declaratory Judgments Act is exceptionally broad in reach and used in all sorts of situations, including any number of contexts that have nothing to do with marriage or family law whatsoever. See, e.g., Wilton v. Seven Falls Co., 515 U.S. 277, 286-87 (1995) (discussing the breadth of declaratory judgment actions). To use the Declaratory Judgments Act, a highly general law, to broaden the scope of Wis. Stat. § 767.313, a highly specific one, as the majority does, is to directly contradict a well-established rule of statutory interpretation.

¶108 The second canon cuts against the majority's holding even more forcefully. In Wis. Stat. § 767.313(2) the legislature unequivocally expressed its intention to prohibit annulments "after the death of a party to the marriage." The majority honors these words in the most superficial sense possible, while completely undermining them in every practical respect. Under the majority's decision, a party seeking to invalidate a marriage can accomplish the exact same result as an annulment if she styles her action as one for a declaratory judgment rather than one for annulment. As a result, the carefully chosen language of the legislature is stripped of all

6

force on the basis of a few strategically placed words in a caption, a consequence we have heretofore been loath to sanction. See, e.g., State v. Petty, 201 Wis. 2d 337, 355, 548 N.W.2d 817 (1996) (reiterating that the court endeavors "to give effect to every word so as not to render any part of the statute superfluous.") (internal quotation marks and citation omitted).

¶109 Tellingly, the majority's device for invalidating marriages exists, by its own account, only to nullify marriages after death. It professes to preserve the common-law rule that "[w]hen the parties to a marriage are alive, the appropriate remedy for voiding a marriage is annulment" whereas "when one of the parties died . . . a declaration that a marriage was void was the proper remedy." Majority op., ¶37 (footnote omitted). To translate, the courts utilize the "declaration of voidness" specifically and exclusively so as to eviscerate the legislature's deadline for invalidating marriages. Though it should not be necessary, I feel compelled to note that on non-constitutional matters the legislature can overrule the courts, not vice-versa. See, e.g., Challoner v. Pennings, 6 Wis. 2d 254, 257, 94 N.W.2d 654 (1959) (recognizing that the legislature "may by amending a statute nullify a supreme court decision . . . .") (citation and internal quotation marks omitted).

D. THE COMMON LAW DOES NOT SUPPORT THE ASSERTED POWER

¶110 To bolster its infirm statutory argument, the majority seeks refuge in the common law. See majority op., ¶¶37-60. There are a number of fatal flaws with its approach. Starting

7

with the threshold question, it is not clear, even in theory, _how_ the common law can work in tandem with the other elements of the majority's reasoning. After all, everything else in the case is, by the majority's own lights, statutory: marriage itself is statutory, id., ¶30, the factors rendering marriages void are statutory, id., ¶33, annulment is statutory, id., ¶35, and the Declaratory Judgments Act is statutory. Id., ¶66. Apparently we are meant to believe that in this field of law, entirely occupied by statute, the "voiding" of marriages somehow snuck in from the common law, even though, as explained above, that power flies in the face of the governing statutory provisions. It is a leap of faith a little too far.

¶111 At any rate, the supposed common-law doctrine upon which the majority is premised simply does not exist. From Wisconsin's earliest years as a state, its courts[3] have been relentlessly imprecise on the matter of whether annulment is the sole avenue for questioning a marriage or simply one option amongst others. Some cases took the former position. See, e.g., Falk v. Falk, 158 Wis. 2d 184, 189, 462 N.W.2d 547 (Ct. App. 1990) ("Annulment is the proper procedure for setting aside both void and voidable marriages.") (citations omitted). Others the opposite. See, e.g., Ellis v. Estate of Toutant, 2001 WI App 181, ¶¶15-17, 247 Wis. 2d 400, 633 N.W.2d 692 (permitting

---

[3] Unlike the majority, I do not find authorities concerning other jurisdictions relevant to the analysis. On the contrary, as this discussion makes clear, the legislative and judicial developments that resolve the appeal are highly specific and unique to our state.

trial courts to invalidate marriages pursuant to the Declaratory Judgments Act). Still others appeared to take both positions at once. See, e.g., Williams v. Williams, 63 Wis. 58, 69, 75, 23 N.W. 110 (1885) (indicating at one point that when a party desires to invalidate a marriage "the action should be to . . . annul" the union, while indicating elsewhere that a void marriage may be called into question "in any proceeding in any court between any parties . . . ."). Yet another group of cases employed language conflating annulment with a judicial declaration of invalidity, making it difficult to ascertain whether there was even a difference between the two. See, e.g., Lyannes v. Lyannes, 171 Wis. 381, 388, 177 N.W. 683 (1920) (discussing the power of a circuit court "to annul and declare as void ab initio a marriage . . . .") (emphasis added).

¶112 The variation in language is not surprising when one considers how closely related and commonly used these different words are in judicial parlance. A court could not be reasonably expected to refrain from using a word like "declare" or "void" while discussing annulment when such terms were perfectly accurate in context. See, e.g., Falk, 158 Wis. 2d at 191 (remarking on a marriage that was "void as a result of the annulment . . . ."). Moreover, there was no decision clearly finding an independent power to declare a marriage void outside of annulment until quite recently, see ¶¶116-17 infra, so the courts can hardly be faulted for inadvertently using language that later gave birth to a distinction they had no good reason to anticipate.

9

¶113 It is also important to remember, though the majority would have you forget, that this ambiguity was largely linguistic, not legal. Whatever phraseology courts may have adopted, inexact though it may have been, their holdings were consistent. As a long and soundly-reasoned chain of cases explains, a marriage can be lawfully undone only through one of two statutory vehicles: divorce or annulment. Wheeler v. Wheeler, 76 Wis. 631, 633, 45 N.W. 531 (1890) ("[W]here the marriage is valid, the judgment is . . . for a divorce; but where the marriage is void, the judgment is to annul it."). Judges enjoy no equitable (or "declaratory," to use the majority's nomenclature) power to act outside those well-paved avenues. Kuehne v. Kuehne, 185 Wis. 195, 196, 201 N.W. 506 (1924) ("[T]he jurisdiction of a court to annul a marriage is statutory, and . . . such a judgment may be entered only for the reasons authorized by statute.") (citation omitted). When the legislature saw fit to end that avenue at death, the courts were thenceforth duty-bound to comply. McCabe, 197 Wis. 2d at 713 n.3 ("Although 'void,'" a marriage contracted in violation of the statutes "governs legal relations unless it is annulled . . . . This may not be done after one of the parties to the marriage dies.") (citations omitted).

¶114 In short, there is no case law establishing a mechanism for voiding a marriage after death other than annulment. Quite to the contrary, the better and clearer case law has always held that courts could use annulment and annulment alone to invalidate marriages, and that they were

10

constrained to follow the procedures constructed by the legislature when they did so. Viewing the cases in the light most charitable to the majority, it has at best a smattering of inconsistent language here and there, some intimating the existence of an independent mechanism, some intimating its nonexistence, some intimating both simultaneously, and some collapsing annulment into "voiding." To glean from this discordant hodgepodge an unambiguous statement of judicial power is, to put it mildly, a stretch.

¶115 In fact, a close examination of the majority opinion reveals some evasiveness on this point. The relevant section is given the definitive heading, "Courts Have the Power to Declare a Marriage Void After the Death of One of the Parties to the Marriage." In the same vein, the body of the section begins with the following overview:

> When the parties to a marriage are alive, the appropriate remedy for voiding a marriage is annulment. However, at common law, when one of the parties died, such that any impediment to a valid marriage was no longer capable of being corrected, a declaration that a marriage was void was the proper remedy.

Majority op., ¶37 (footnote omitted). With one arguable exception, discussed in a moment, the cases cited in the following section cannot fairly be characterized as standing for such a proposition, and the majority, to its credit, does not even attempt to make the case that they do. The teaching that the majority actually, and accurately, draws from the cases is merely that Wisconsin courts historically allowed for the posthumous invalidation of marriage, not that such invalidations

11

could be obtained through a "declaration of voidness." See id., ¶48 ("[T]he Williams court concluded that a void marriage, whatever the mechanism or process for challenging the validity of the marriage, may be challenged in the lifetime or after the death of the marriage parties . . . .) (emphasis altered); id., ¶54 ("[T]he Lyannes court continued to recognize the ability of a court to invalidate a marriage after death.") (emphasis added) (footnote omitted); id., ¶57 ("According to the" court in Davidson v. Davidson, 35 Wis. 2d 401, 151 N.W.2d 53 (1967), "the issue of whether to allow the annulment action to continue depended upon whether the marriage was void or voidable . . . .").

¶116 It is quite true that these and other cases recognized that a party could challenge a marriage after one of the spouses passed away, and quite beside the point. Until 1977, there was, with one exception,[4] no prohibition on annulling a marriage when one of the partners in the marriage was deceased. It therefore hardly comes as a surprise that courts allowed for such annulments. That in no way implies the existence of an independent type of challenge, i.e., the so-called "declaration of voidness."

¶117 The only case that holds to the contrary is Toutant, which justifiably receives most of the majority's attention. See majority op., ¶¶37-42, 65. In that case, handed down in 2001, the court of appeals granted, for the first time in

---

[4] See Wis. Stat. ch. 109, § 2351(2) (1909) (providing that an action to annul a marriage on the grounds that the spouses were cousins could not be brought after death).

12

Wisconsin history, a power to circuit courts to "declare" marriages "void" under the Declaratory Judgments Act. But Toutant cannot support the majority's "common-law" rule either, for two reasons: 1) it was not a common-law decision and 2) its reasoning is obsolete. The first point is self-evidently true because Toutant itself situated the power to "declare voidness" in the Declaratory Judgments Act, a statute, not in the common law. 247 Wis. 2d 400, ¶22.

¶118 As for the second point, one need only take a moment to consider Toutant's own succinct articulation of its reasoning:

> Wisconsin Stat. § 767.03 states, "No marriage may be annulled or held void except pursuant to judicial proceedings. No marriage may be annulled after the death of either party to the marriage." While the first sentence expressly prohibits both the annulment or voiding of a marriage except pursuant to court proceedings, the second sentence pointedly prohibits only annulment after the death of either spouse. Thus, a marriage can be declared null and void after the death of a spouse. All arguments concerning annulment are therefore immaterial.

Id., ¶16 (emphasis added). In other words, Toutant explicitly relied upon the "or held void" language that the legislature subsequently excised. The majority deems the removal of that language a routine, housekeeping clarification, noting that the drafters declined to announce that they were responding to Toutant. Majority op., ¶76. It makes no difference whether they were or not. What matters is that the Toutant court certainly ascribed meaning to the language, and undoubtedly would not have ruled as it did in the absence of those three now-erased words. Consequently, the only precedent

13

even remotely supportive of the majority's thesis is, in light of the rationale underlying that precedent, outdated.

E. EVEN IF THE COMMON LAW SUPPORTED THE ASSERTED POWER, IT WAS ABROGATED BY THE LEGISLATURE

¶119 Granting arguendo the existence of this nonexistent common-law doctrine, there remains the intractable problem of the 2005 revisions. The court writes off those revisions as insufficiently clear and unambiguous to displace the common law. Majority op., ¶77. To the contrary, I do not see how the legislature could have been clearer or less ambiguous. The "or held void" language was there, and then it was gone. And it is entirely absent from the rest of the marriage statutes,[5] including, most conspicuously, Wis. Stat. § 767.001, which lists "actions affecting the family" and notably omits any mention of "holding void," "declaring void," or the like. If such decisive action cannot abrogate the common law, what can? Simply and plainly put, when the legislature removed the phrase "or held

---

[5] Wisconsin Stat. § 766.01(7) defines "dissolution" with reference to "a decree of dissolution, divorce, annulment or declaration of invalidity . . . ." (Emphasis added.) However, it also notes that "[t]he term does not include a decree resulting from an action available under ch. 767 which is not an annulment, a divorce or a legal separation." § 766.01(7). Because the majority rightly recognizes that a "declaration of voidness" is not available under the annulment statute, this definitional provision does not suggest that Wisconsin law allows for any "declaration of invalidity" outside of the annulment statute. Likewise, Wis. Stat. § 767.803 makes passing reference to "marriages declared void" but there is no evidence that it means anything other than "annulled marriages," which is precisely how it has been interpreted. Rascop v. Rascop, 274 Wis. 254, 79 N.W.2d 828 (1956). These provisions have no bearing on the case.

14

void" from the statutes, whatever right an individual might have had to invalidate a marriage outside of annulment was removed with it.

¶120 Interestingly, as an example of clear and unambiguous abrogation, the majority points to the legislature's prohibition of posthumous annulments on consanguinity grounds. Majority op., ¶54 n.17. I could not agree more. But if a ban on posthumous annulments in one narrow, confined set of circumstances is clear and unambiguous, why is the legislature's 1977 ban on <u>all</u> posthumous annulments not as well?

F. POLICY CONSIDERATIONS DO NOT SUPPORT THE ASSERTED POWER

¶121 The majority concludes with a recitation of the policy goals advanced by its rule. Majority op., ¶¶78-80. Now, we are assured, "an incompetent decedent's estate or an aggrieved party" will not be "simply out of luck" and "a court's power to address fraud, mistake, and other exigencies in a disputed marriage" will be preserved. <u>Id.</u>, ¶79-80. Valid considerations, to be sure. As is so often the case, however, there are equally valid considerations on the other side of the equation. Just as the limitation embodied in Wis. Stat. § 767.313, if we faithfully enforced it, would unfairly disadvantage some individuals, the limitless access to declaratory judgments made possible by the majority will unfairly disadvantage others.

¶122 Consider the case of a fully competent wife who marries a fully competent husband. The husband's relatives want nothing to do with him until he grows ill, at which point they

15

manage to obtain a questionable medical opinion that he was incompetent when he signed the wedding certificate. Upon the husband's death, the relatives go to court, seeking to nullify the marriage and inherit the assets that would otherwise pass to the wife. Though the marriage "will be presumed valid," majority op., ¶81, the unscrupulous relatives have the benefit of documentary medical evidence, and the innocent wife may have only her own, self-interested (albeit truthful) word. Is such a scenario more inequitable than the hypotheticals feared by the majority?

¶123 None of which is to say that this describes McLeod's situation. Nor is it to say that the worries on one side of the ledger are more compelling than those on the other. It is only to show that the policy choice here is a difficult one, with powerful competing interests at stake. In forbidding posthumous annulments, the legislature made that difficult choice. It is not for us to second-guess its judgment. See, e.g., Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶60, 281 Wis. 2d 300, 697 N.W.2d 417 ("When acting within constitutional limitations, the legislature settles and declares the public policy of a state, and not the court.") (internal quotation marks and citation omitted).

¶124 Like most mythical creatures, the power to "declare a marriage void" is neither fish nor fowl, neither statutory, nor judge-made, nor a legitimate policy decision made by the appropriate branch of government. It may have roamed the earth once, but if so it has long since gone extinct.

16

## II.  CONCLUSION

¶125 The legislature has not been blameless in generating the confusion that has led to the present state of affairs.  At the very least, it could have made plain its intention in removing the "or held void" language in 2005.  Presumably it will be aware of the court's decision, and hopefully it will take the opportunity to lay to rest, once and for all, the persistent uncertainty that has plagued this important issue for too long.

¶126 When the legislature does revisit the question, it might keep in mind the worryingly extreme consequences of its current all-or-nothing approach.  Under the majority's misguided reading of the law, as noted, a marriage can apparently be challenged at any time after the death of a party, no matter the circumstances or the evidentiary obstacles.  Under the correct reading of the law, as set forth here, equally disturbing situations may arise.  A marriage between, say, a minor and an adult, would remain valid after the death of the adult, even if uncontested documentation established the voidness.  Cf. McCabe, 197 Wis. 2d at 713 n.3 ("Although 'void,'" a marriage contracted in violation of the statutes "governs legal relations unless it is annulled . . . .  This may not be done after one of the parties to the marriage dies.") (citations omitted).  This is so because annulment is the only means to invalidate a marriage that is either void or voidable.  Falk, 158 Wis. 2d at 189.  The law has not drawn any further distinctions within the void category regarding marriages in which there is incontrovertible

17

evidence, like a birth certificate in the preceding example, obviating the need for any further fact-finding. It may make good sense, as a policy matter, for the legislature to allow courts to invalidate such marriages.

¶127 In the meantime, I would hold, for the reasons stated, that the circuit court properly declined to exercise a power it did not possess, and would therefore affirm its decision. Because the majority instead elects to give a longstanding misunderstanding the force of law, I respectfully dissent.