MADISON TRUST COMPANY, Administrator, Respondent, vs. HELLECKSON and another, Appellants.

*November 5—December 4, 1934.*

444

For the appellants there was a brief by *Sanborn, Blake & Aberg, Philip G. Sanborn,* and *Charles A. Winding,* all of Madison, and oral argument by *W. J. P. Aberg.*

For the respondent there was a brief by *Michelson & Forkner* of Madison, and oral argument by *Austin Forkner, A. J. Michelson,* and by *John E. Ferris, Jr.,* of Milwaukee.

FOWLER, J.    The appellants contend that the court erred: (1) In overruling their demurrer *ore tenus* to the complaint, and (2) in denying their motion to strike certain allegations of the complaint; that the evidence was insufficient to support the findings of the jury, (3) as to fraud in procurement of the release, and (4) upon the issue of negligence, (5) that the damages assessed by the jury are excessive; that the court erred (6) in instructing the jury; and that this court should direct dismissal of the complaint or order a new trial.

(1) (2) The appellants devote five pages of their brief to support their contentions that the complaint does not state a

cause of action because of insufficiency of its allegations of fraud in procuring the release, and that the court erred in refusing to strike all the allegations of the complaint relating to said issue. The preparation and presentation of all this is . labor lost. When a trial court has proceeded with the trial of a case and taken a verdict and entered judgment thereon, this court will ordinarily devote its attention to whether the evidence supports the verdict and judgment, and consider the complaint amended to accord with the facts found, if the complaint as framed is insufficient to support them, and whether any immaterial or irrelevant evidence was admitted upon the trial that invalidates the verdict, and will do so here. Error is not assigned for admission of immaterial or irrelevant evidence upon the trial, nor was it claimed upon the argument nor is it claimed in the briefs that any such was admitted. The motion to strike, being aimed at the entire cause of action to set aside the release, was in effect a mere repetition of the demurrer *ore tenus,* and therefore entirely useless. The demurrer having been overruled, denial of the motion would follow as a matter of course.

(3) The appellants argue that the parents of the child, as intelligent persons able to read and to comprehend the language of the release, having had ample opportunity to read the release and consider its terms, and no artifice having been resorted to to obtain their signatures, may not be heard to say that they did not understand its contents and understood that it was a mere receipt for money. We consider this position well taken. But this does not cover the whole issue of fraud in inducing its execution. The questions submitted upon this issue did not go to the proposition of misunderstanding of the terms of the release or misrepresentation of its nature or contents. The inducing representations covered by the questions were that the insurer's agent represented that, (a) the instrument and payment thereunder were "for a mere gratuity, a customary gesture of good will in a non-

liability case," and, if suit was brought, the gratuitous offer would be withdrawn and the action would be useless; and that (b) unless the driver of the car was found guilty of gross or criminal liability there could be no liability at all, and that if he was found guilty it would result in his being sent to prison; that he was already in bad with the police department, and this would be bad for him; and might result in the death of his mother.

We are of opinion that these representations taken as a whole, if established by the evidence and false, and justifiably relied on by the parents, are sufficient to avoid the release. Some of them, if standing alone, doubtless would not support avoidance because immaterial. As, for instance, that the driver of the car would be sent to prison, and that he was already in bad with the police department and it would be bad for him. But others were fraudulent in character. The statement that it was customary as a gesture of good will to give gratuities in non-liability cases itself would be immaterial and of itself would not form a basis for avoidance of the release, but for the fact that it carries the imputation that this was a non-liability case, and that is a different matter, as are the statements that an action would be useless, and that there would be no liability unless the driver of the car was guilty of criminal negligence. The agent who made the statements is an attorney at law, and he had made an investigation of the facts which the parents might rightly assume was full and fair, and which they might rightly rely upon. That liability did not exist upon the facts and that suit would be useless might be matter of opinion if honestly made by a person not a lawyer assuming to advise the party adverse to the party he was representing. The statement that there could be no liability at all unless the driver was found guilty of gross or criminal negligence could not have been honestly made, as it was necessarily known to be false by the agent as a practicing attorney. Statements that would be matters of opinion if honestly made become statements of fact if the one

who makes them does not himself entertain them. *Birdsey v. Butterfield,* 34 Wis. 52. Whether statements are to be considered as matters of fact or matters of opinion depends on whether the person to whom they are made may rightly rely upon them. *Karls v. Drake,* 168 Wis. 372, 170 N. W. 248; *Swoboda v. Rubin,* 169 Wis. 162, 170 N. W. 955. The jury here found that the parents were justified in relying upon these statements. It is urged that the statements are matters of law and consequently might not rightly be relied on. It is true that they are or partake of the nature of matters of law, and that a representation of a matter of law does not ordinarily constitute a basis for an action for fraud. But—

". . . even though misrepresentations are in part in relation to matters of law, if they are made by one who has superior means of information and professes a knowledge of the law, and thereby obtains an unconscionable advantage of another, who is ignorant and has not been in a situation to become informed, the injured party is entitled to relief, just as well as if the misrepresentation had been concerning a matter of fact." *Allison v. Wm. Doerflinger Co.* 208 Wis. 206, 242 N. W. 558.

We are of opinion that the circumstances here involved bring the case within the rules of the cases above cited, and that the representations found, if the evidence supports the findings, form sufficient basis for rescission of the release.

Counsel argue that the language of the questions submitted is confusing and was incomprehensible to the jury. It is seldom, in a fraud case involving numerous alleged misrepresentations, that the basic questions can be so framed as to avoid criticism of their form. We will pass the matter by saying that some of the criticisms here made are hypercritical, and that the questions are intelligible to this court and presumably were intelligible to the jury. They seem to cover statements which it is claimed the insurer's agent made.

It is contended that the findings above referred to, and those as to reliance by the parents upon the representations found and justification for the reliance, are not supported by

the evidence. The findings upon the basic questions clearly are not supported by the testimony of the agent of defendants who procured the release. But his testimony is disputed by the parents and it was for the jury to decide between the embattled witnesses. As to reliance upon these representations, it is urged that the parents were represented by an attorney who advised the execution of the release, and that they relied on his advice rather than on the representations of insurer's agent. It is true that the parents engaged an attorney to investigate the facts and advise them, and that after such investigation as he made he reported there was no liability, and did advise that they accept the payment of the funeral expenses of the child. But his investigation consisted of interviewing the insurer's agent who is alleged to have made the representations charged, and one eye-witness to the accident, a welfare worker, Mrs. Williams, whose statement the insurer's said agent had previously obtained. This statement was also made by Mrs. Williams to the coroner, to the chief of police, and to the district attorney, as the attorney for the parents knew. The attorney also understood that Mrs. Williams was the only eye-witness of the accident. He interviewed the insurer's agent who had made a complete investigation of the case, and the jury might rightly infer that he understood from him that the case was one of non-liability. The statements of Mrs. Williams above referred to were induced by the agent of the insurer who procured the release, and by the testimony of Mrs. Williams and another relief worker, and were improperly influenced by him. Relying on statements of Mrs. Williams and insurer's agent, the parents' attorney advised them by letter dated March 29th to accept the funeral expenses. The mother sent for the insurer's agent on April 5th through the wife of defendant Helleckson, and the agent came the next morning pursuant to the call, but the jury were justified in believing that the

mother had been requested by Mrs. Helleckson, upon direction of the agent, to send for the agent when the funeral bills were all in. There had been nothing said about a release. The jury might infer that all the mother was thinking about was getting the money to pay the funeral expenses which the parents understood the defendant insurer had offered to pay, and it does not necessarily follow from the decision to accept the money that the parents had decided to give a release, nor does such decision necessarily preclude the inference by the jury that the signing of the release was in fact induced by the representations made by the agent upon the morning it was signed. We are of opinion from the whole evidence bearing upon the matter that the inferences of the jury were warranted that in signing the instrument the parents relied upon the representations at the time made, and that they were not wanting in due care in so relying.

It may further be said upon this point that viewing the evidence in the light most favorable to the plaintiff there are indications of unfairness in procuring the release that may well have influenced the jury. The parents were "on county relief" and without funds with which to bury their child. They naturally would not want their child buried in a pauper's grave or denied a decent burial, which they well may have thought would result if the body was prepared and buried at public expense. The jury might properly infer that the insurer's agent operated on this theory, and that he called at the parents' residence early in the morning after the accident and told the father that "no matter what the evidence showed" the insurer "would forward or give" the parents the money to pay the funeral expenses, "not because they had to, but as a gesture of good will" and "good business policy;" that he then said he had talked with some of the witnesses and expressed grave doubt whether liability existed; that the driver of the car, a boy of eighteen years, would suffer

greatly in the event of an investigation, as he was already in bad with the police; that, for the parents to collect, it would be necessary to prosecute the boy, and find him guilty of gross or criminal negligence, which would probably mean a jail or prison sentence; and that this would go doubly hard with his mother who was in very poor health and might cause her death. This, if the testimony of the parents was true, was undue haste and unethical conduct. The insurer's agent might very properly investigate promptly the circumstances of the accident, and interview all persons whom he could ascertain saw the accident. But the father did not see the accident. The mother testified that the agent had even called her by telephone at the hospital the evening of the accident, said he was representing the insurer, "expressed his sympathy and said he would do anything he could to help" the parents. These were unseemly times for the agent of the insurer to attempt to ingratiate himself with the parents, to persuade them into the belief that no cause of action existed, and to dissuade them from instituting proceedings to prosecute the driver of the car, all with the view, as might properly be inferred, of eventually procuring a release of all damages by payment of the funeral expenses of the child. The payment made only covered these expenses and $25 for the parents' attorney. The parents received nothing whatever for themselves but this $25 which the attorney told them to keep because "they needed it more than he did." Inadequate consideration is itself a badge of fraud, and, in view of the damages assessed herein, the consideration for the release was grossly inadequate. In determining the entire fraud issue the jury may properly consider all circumstances shown bearing in any way upon the several issues involved, one of which is the intent and motive of the person charged with the fraud. His conduct shown may indicate much as to the influence he was able to exert upon the persons defrauded, and

as to the extent of their reliance upon his representations. The findings of fraud here made have been approved by the trial judge and we should not overthrow the determination of the judge and jury if in any reasonable view it may be considered to be sufficiently supported, and we are of opinion that it is.

(4) The contention of appellants that the findings of negligence are insufficiently supported seems to rest principally upon the view that the statement of Mrs. Williams first made as above stated should be taken as the facts of the case. This statement was upon the trial declared by her to be false, and to have been influenced by the persuasions of the insurer's agent that induced her to attempt to shield the driver of the car from prosecution. She testified that besides saying to her much of what he said to the father of the child as above related, the agent made other statements to her to influence her statement of what happened. The child's family was one that Mrs. Williams as a relief worker had regularly visited, and she was especially interested in the parents' situation. She testified that she said to the agent : "There will be something done" for them, and he replied : "Oh yes, yes, the child died. The insurance company always makes adequate settlements for the death of a child. Nothing could be done to bring it back. The pressing matter now was the situation of the boy. My testimony would decide it. If the car was going at a pretty good rate of speed it would go hard with the boy, and that as I was the only witness I would have to make up my mind what I should say. The family would be taken care of and I should think about the boy." Mrs. Williams claimed that as the family were to be taken care of, she fashioned her statement of the accident to shield the boy from prosecution. A statement she gave to the insurer's agent was taken down by his stenographer. Another welfare worker who was present at the interview between Mrs. Williams and

the insurer's agent testified that the agent dictated the statement and that she heard him say several times, "Let us put it this way." The testimony of these witnesses was denied by the agent and his stenographer, but the jury were the judges of the truth as to this, as they were the judges as to which of the statements were true. Mrs. Williams' testimony on the trial, if true, justifies the jury's verdict. But the verdict does not rest on her testimony alone. The findings stated in the statement preceding the opinion are supported by four other witnesses who testified that the car that struck the child was traveling twenty-five to thirty, thirty to thirty-five, thirty-five and thirty-five to forty miles per hour, and did not begin to slacken speed until thirty-five or forty feet past the place where the girl was struck. A taxi driver sitting in a car twenty feet from the place of the accident put the speed at thirty-five to forty miles per hour. The skid marks of the car began thirty-five or forty feet beyond the place of accident. The accident occurred on a city street where the statutory speed limit was twenty miles per hour. The horn of the car was not blown. The girl looked both ways before starting to run across the street. The driver admitted at the time of the accident that he did not see the girl before he struck her. It was a straight street. There was nothing to obstruct the driver's view. This testimony was disputed only by the driver of the car and the previous statement of Mrs. Williams. It warranted the jury's findings. We would not be understood as accepting Mrs. Williams' statements upon the trial or those of the parents of the child. The agent denied them. We only hold that the truth or falsity of these statements was for the jury to decide.

(5) The jury assessed the parents' damages at $3,700. Sec. 331.04 (2) provides that in addition to the damages for their "pecuniary injury" resulting from the child's death the jury may award "a sum not exceeding two thousand five

hundred dollars for loss of society and companionship." The verdict does not separate the latter damages from the former. The girl killed was an only child, five years old. Her parents, as above stated, were "on the county poor relief roll." The father was thirty-three years old, was a painter, and had been out of work for six months or more. The mother was twenty-seven years old, and it does not appear that she ever engaged in or is fitted for any gainful occupation. Both parents had attended high school for two or three years. The jury are authorized by the statute cited to allow what they deem "just and fair" to compensate for the "pecuniary loss" the parents sustained as result of the child's death. The jury may have considered it likely that the child would during her late minority and afterwards be able to contribute to the parents' support, and in view of their circumstances would do so. In view of the authorized statutory allowance for loss of society and companionship above stated and the wide discretion of the jury in fixing that allowance and pecuniary loss, we cannot say that the total allowance is more than a jury properly actuated might allow.

(6) Appellants complain that the court should have given instructions requested by them to the effect that the jury should consider whether the parents were mentally capable of understanding the release; and that if the parents did not read the release the jury should consider whether their failure to read it was due to their own negligence; and that if the parents did not read it, in considering whether their failure to do so was due to the representations of the insurer's agent, the jury should consider only the representations relating to the instrument itself or its effect. Had the question of the parents' understanding of the release been submitted to the jury these instructions or their equivalent should have been given. But no such question was put to the jury, presumably because the court considered the failure of the parents to

understand the release if they did not understand it was due to their inexcusable failure to read it, and that the question of their understanding of it was not, as we have stated above, for consideration of the jury. Fault is found that the jury were not instructed that they should consider the fact that the parents were represented by an attorney. Such an instruction might well have been given, but none such was requested. Complaint is lastly made that the jury should have been instructed in accordance with a request submitted by the defendants relating to consideration of the relationship between the parents and the insurer's agent in determining whether the parents relied on the agent's representations. An instruction as to the absence of relationship might properly have been given, but as there was no relationship at all of blood or marriage and nothing appears in the instruction of the court in reference to any confidential relationship, we consider that no prejudice resulted from not giving such instruction. The instruction was so framed as to apply to a situation where relationship in the ordinary sense exists, and the court may have rejected it because it had no application to the instant case where there was no such relationship.

*By the Court.*—The judgment of the circuit court is affirmed.