RASCOP, Appellant, vs. RASCOP, Respondent.

*November 9—December 4, 1956.*

For the appellant there were briefs by *F. E. Van Sickle* of Barron, attorney, and *Doar & Knowles* of New Richmond of counsel, and oral argument by *Warren P. Knowles III.*

For the respondent there was a brief by *William A. Cameron* and *Howard W. Cameron,* both of Rice Lake, and oral argument by *William A. Cameron.*

MARTIN, J.   Action was commenced under sec. 247.05, Stats., the cause of action being that stated in sec. 247.02 (4). The complaint alleges:

"3.   That for the purpose of inducing the plaintiff to consent to said marriage, the defendant falsely and fraudulently represented to him that he was the father of a child born to her and that if he would marry her for the purpose of legitimizing said child, that she would not at anytime seek or ask in any manner for moneys in any nature and that she would not accept or receive any money or thing of value from the plaintiff in the event the plaintiff should commence a divorce action, which representations the plaintiff believed to be true.

"4.   That the defendant in fact had no intention of abiding by the terms of said agreement and when the terms of a settlement in a divorce action were discussed with her and her attorney, she demanded the sum of five hundred dollars per month alimony and support money.

"5.   That said marriage has never been consummated nor have the parties lived together since the ceremony was performed and the defendant has continued to use her maiden name both socially and in her conduct of her profession."

Since the action is based on fraud, the evidence must be clear and satisfactory. The rule is so well established as to require no citation of authority. It was the trial court's opinion that the evidence in this case did not meet such test, and we agree.

Plaintiff contends he was induced to marry the defendant by various misrepresentations of law and fact made to him by her and/or her brother. He testified they told him it was

common practice in Wisconsin, and legal, for a man to lend his name for the purpose of legitimizing a child. He stated he was willing to do so, not because he felt any obligation in the matter, but just to be a "good fellow."

Sec. 245.36, Stats., provides that the lawful marriage of the father and mother of an illegitimate child (with an exception not here material) shall legitimize the child.

Assuming the false representation was made, we cannot see that it was material. Although plaintiff stated he never admitted or denied that he was the father of the child, this is a case where actions speak louder than words. He testified to acts of intercourse with the defendant on frequent occasions during the period of time when the child was conceived. Upon learning she was pregnant he voluntarily arranged and paid for her lying-in, visited her at Fond du Lac, arranged and paid for her return to Minneapolis, bought the child's clothes, voluntarily provided funds for its support, was at all times solicitous about the child and, after his wife died, took it into his home where it was known as Tommy Rascop and where it still remained at the time of the trial.

This is not a situation where a man, to be a "good fellow," agrees to marry the mother of another man's child simply because he has been led to believe the child will thereby be legitimized. In fact, another alleged misrepresentation is that defendant told him he would be denied the privileges and benefits of the Catholic Church if he did not legitimize the child. It is at least inconsistent to say in one breath that the contemplated marriage was meant only to "lend" his name to a child not his and, in the next, that he feared excommunication if he did not. Incidentally, with regard to the latter allegation, plaintiff says he is a "very devout Catholic." If so, he well knew that the proper source of the necessary information was one who is authorized to speak for the church on such matters. His story does not ring true.

It is argued that defendant and her brother took advantage of the plaintiff because they possessed superior means of information and knowledge of the law, citing *Allison v. Wm. Doerflinger Co.* (1932), 208 Wis. 206, 242 N. W. 558, and *Madison Trust Co. v. Helleckson* (1934), 216 Wis. 443, 257 N. W. 691, to the effect that under such circumstances the injured party may obtain relief. Not only had the plaintiff studied law for some years and it might be presumed he could easily have apprised himself of the law, but the evidence shows that in almost all the discussions with regard to the civil-marriage plans, plaintiff's attorney was present. Even though it was understood the antenuptial agreement was to be submitted to Shefner before plaintiff would sign it, plaintiff knew of the terms agreed upon in conference with his attorney, he read the document before he signed it, and he signed it without objection and without submitting it to Shefner, thereby voluntarily waiving that condition.

Plaintiff further contends that the trial court did not give the proper weight to facts allegedly showing duress and the intention of the parties with respect to consummating the marriage. We can see no duress in the agreement of a man to marry where he has protected himself by the presence and advice of his legal counsel.

So far as the intention of the parties with respect to the marriage is concerned, plaintiff's acts subsequent thereto are highly significant. After the marriage he gave the defendant an expensive diamond ring. He also purchased a matched wedding ring but would not give it to her, testifying:

"I said, 'That is for us when we get married. Now, let's keep this straight.' Oh, I was emphatic about that. . . ."

He further testified that about two weeks after the marriage he visited his priest "to see if we couldn't get married because up to this time, it was only this mock marriage which

they called it and the marriage was to come later." The priest, on learning of the civil ceremony, prescribed twelve weeks of penance for them both, at the end of which period, September 27, 1954, they could have the marriage recognized by the church. Plaintiff made three different appointments with the priest for the purpose of having the marriage blessed, the last of which was for October 8th. In the meantime plaintiff and defendant went to church together every morning, after which they returned to plaintiff's home for breakfast before going to work. It is also significant that the antenuptial agreement stated:

"It is also agreed by and between the first party and second party that this contract and agreement shall become null and void upon the intended marriage being blessed by the Roman Catholic Church it presently being contemplated that intended marriage be by civil ceremony alone. However, in the event that said civil marriage is blessed at any time in the future this entire agreement shall immediately become void."

All the facts present the picture of a man who had every intention of making this a valid marriage in the eyes of the church as well as in the eyes of the law.

The evidence of fraud was far from clear and convincing. The trial court properly found that the child is the son of the parties and that the marriage is valid.

Some argument is made with respect to the validity of the antenuptial agreement. The question is not presented on this appeal. Plaintiff introduced it in evidence and we have considered it along with all the other evidence in so far as the statements made therein appear to have any bearing on the issues involved. Facts which might bring its validity as a contract into question are not before us.

As to the motion for review. Defendant's attorneys requested allowance of fees in the amount of $1,500, based on charges of $100 a day for work out of court and $200 a day for trial work. The trial court allowed fees of $1,000. Two

attorneys of long experience and high repute testified that the fees were generally not excessive, although there was evidence on which the trial court could justify some reduction. Since the matter is one which lies within the discretion of the trial court, we are not inclined to substitute our own, even though we would be better satisfied with a larger allowance.

It may be noted, however, that the court felt defendant should pay $150 of the $1,000 fees allowed. Plaintiff points out in his reply brief that we have held in some cases that a wife may properly be required to bear part of the cost of an action for divorce. This is an action for annulment, not divorce, and no case has been cited holding that the wife in the successful defense of an annulment action has been required to pay part of her attorney's fees. The marriage is valid; the law requires the husband to pay for necessities furnished to his wife, and in this instance the fees were necessarily incurred by reason of plaintiff's attack on the validity of the marriage. Moreover, the evidence shows that the plaintiff's position as hospital superintendent provides him with a salary of $12,000 a year plus a Cadillac car and a house to live in. The defendant is a nurse and there is no showing that she has more than a moderate income. Under all the circumstances it is our opinion that plaintiff should be required to pay the entire amount of defendant's attorneys' fees allowed by the trial court.

*By the Court.*—The judgment is modified to require the plaintiff to pay the entire amount of defendant's attorneys' fees, and, as so modified, it is affirmed.