MICHAEL J. GABLEMAN, J.
¶ 98. 0dissenting). There is great confusion in this area of Wisconsin law, and there has been for many years. The majority makes a valiant effort to clarify it, exhaustively and eloquently summarizing the statutory and jurisprudential developments that have brought us to the present quandary. *226 Unfortunately, though, the court's ultimate resolution of the question presented codifies a legal misunderstanding that has been germinating for decades and now bursts into full bloom. Although the issue we take up here is not an easy one, it can and should be disposed of on the basis of a simple proposition: annulment is the only process for invalidating a marriage other than divorce, as per the legislature's wishes, and that process cannot be undertaken after the death of a spouse. It was the legislature's prerogative to limit the remedies available to parties challenging marriages, and it is not our place to expand them beyond their statutory confines. Because the majority holds otherwise, I respectfully dissent.
I. DISCUSSION
¶ 99. The majority cobbles together a variety of statutory and common-law sources in its mission to prove the existence of a posthumous means to invalidate marriage outside of annulment. I take up each source in turn and demonstrate why it does not substantiate the asserted power.[1]
A. THE ANNULMENT STATUTE DOES NOT SUPPORT THE ASSERTED POWER
¶ 100. The majority does not claim that Wis. Stat. § 767.313 (2009-10),[2] the annulment statute, estab *227 lishes the power to nullify a marriage after death. Nevertheless, it is worth beginning with the provision's history. For that history not only provides no support for such a power, it actually conclusively proves that none exists.
¶ 101. There is no need to set forth all the various and sundry changes made to the statute over the decades, as the majority ably does. For present purposes, there are only two salient features to its evolution. First, in 1909 the legislature began listing grounds for annulment, including incompetence. Majority op., ¶ 49 n.16. At the same time, it started to "placeQ limits on when an annulment action could be brought," id., most significantly barring the posthumous annulment of a marriage between cousins. Wis. Stat. ch. 109, § 2351(2) (1909). In the ensuing years it continued that process and, in 1977, imposed the most important limitation with respect to this dispute, pronouncing that any annulment, regardless of the grounds for the action, could no longer be obtained after the death of either of the spouses. Majority op., ¶ 71 n.22.
¶ 102. The second relevant turn of events began in 1959, when the legislature inserted the following emphasized language into the annulment statute: "[n]o marriage shall be annulled or held void except pursuant to judicial proceedings." 1959 Wis. Laws, ch. 595, § 44 (emphasis added). Nearly 50 years later the legislature withdrew those three crucial words. 2005 Wis. Act 443.
¶ 103. Taken together, these two parallel developments underscore two legislative directives: 1) lawmakers wanted to restrict the circumstances in which marriages could be invalidated, first ruling out posthumous invalidations for some annulments as one of those restrictions, and then ruling out posthumous invalidations altogether; and 2) they wanted, at one point, to *228 acknowledge a route to invalidation other than annulment and then, at a later point, to retract that acknowledgement. Stated differently, the right to a posthumous annulment was taken away, and then the right to have a marriage "held void" was as well. In sum, the majority restores to circuit courts an authority that the legislature eradicated through a hundred years of statutory refinement.
B. WISCONSIN STAT. § 765.03 (1) DOES NOT SUPPORT THE ASSERTED POWER
¶ 104. Since the history of the annulment statute is so unhelpful to its cause, the majority focuses far more heavily on another statute: Wis. Stat. § 765.03 (1). That section provides that "[a] marriage may not be contracted" in cases of sufficient incompetence. In the majority's view, "[t]he action to void a marriage comes through" § 765.03 (1). Majority op., ¶ 74. This cannot be so. Section 765.03 does not purport to endow courts with the authority to do anything. It is true that the statutes categorize a marriage with an incompetent spouse as "null and void," Wis. Stat. §§ 765.21, 765.002(6), but nowhere, outside of the annulment statute, do they empower courts to invalidate marriages on that ground. The mere fact that a statute makes a statement about the world does not entitle a court to do whatever it likes with that statement. Indeed, the application and enforcement of several of the most important rules in our system of government are entirely outside the province of the judiciary. See, e.g., Luther v. Borden, 48 U.S. 1 (1849) (forbidding the courts, on political question grounds, from considering cases concerning the federal constitution's guarantee of a republican form of government). It is particularly *229 improbable that Wis. Stat. § 765.03 provides courts with a license to enforce its requirements however they like when there is another statute, only a few pages later in the statute book, that is plainly designed as its enforcement mechanism. See State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W2d 110 ("[Statutory language is interpreted ... in relation to the language of surrounding or closely-related statutes ....") (citations omitted). Wisconsin Stat. § 765.03 (1) spells out grounds to invalidate marriages through the annulment process, and with the limitations imposed on that process, including the limitation preventing post-mortem annulments. Cf. Sinai Samaritan Med. Ctr., Inc. v. McCabe, 197 Wis. 2d 709, 713 n.3, 541 N.W.2d 190 (Ct. App. 1995) (observing that an action to invalidate a marriage as violative of § 765.03 (1) must be filed under the annulment statute). Wisconsin Stat. § 765.03 (1) provides the majority no succor.
C. THE DECLARATORY JUDGMENTS ACT DOES NOT SUPPORT THE ASSERTED POWER
¶ 105. Perhaps sensing that Wis. Stat. § 765.03 cannot withstand the weight it is asked to carry, the majority turns also to the Declaratory Judgments Act, Wis. Stat. § 806.04. See majority op., ¶¶ 65-69. That statute is not up to the task either. As an initial matter, it is curious that the court would place such heavy emphasis on the Act in this of all cases, given that neither the objectors nor the circuit court ever relied upon it. The circuit court granted a petition for formal administration of the estate, not a motion for declaratory judgment.
*230 ¶ 106. Even if the Declaratory Judgments Act had played a role below, it should not play a role in our decision. Two of the most universally accepted canons of statutory construction compel us, respectively, to favor a more specific statute over a more general one, see, e.g., Marlowe v. IDS Prop. Cas. Ins. Co., 2013 WI29, ¶ 45, 346 Wis. 2d 450, 828 N.W.2d 812, and to give effect to every word the legislature enacted if possible. See, e.g., State v. Koopmans, 210 Wis. 2d 670, ¶ 14, 563 N.W.2d 528 (1997). Both canons counsel against the majority's approach.
¶ 107. Wisconsin Stat. 767.313 was written specifically to elucidate the process for obtaining a judicial determination regarding the validity of a marriage. By contrast, the Declaratory Judgments Act is exceptionally broad in reach and used in all sorts of situations, including any number of contexts that have nothing to do with marriage or family law whatsoever. See, e.g., Wilton v. Seven Falls Co., 515 U.S. 277, 286-87 (1995) (discussing the breadth of declaratory judgment actions). To use the Declaratory Judgments Act, a highly general law, to broaden the scope of Wis. Stat. § 767.313, a highly specific one, as the majority does, is to directly contradict a well-established rule of statutory interpretation.
¶ 108. The second canon cuts against the majority's holding even more forcefully. In Wis. Stat. § 767.313(2) the legislature unequivocally expressed its intention to prohibit annulments "after the death of a party to the marriage." The majority honors these words in the most superficial sense possible, while completely undermining them in every practical respect. Under the majority's decision, a party seeking to invalidate a marriage can accomplish the exact same result as an annulment if she styles her action as one *231 for a declaratory judgment rather than one for annulment. As a result, the carefully chosen language of the legislature is stripped of all force on the basis of a few strategically placed words in a caption, a consequence we have heretofore been loath to sanction. See, e.g., State v. Petty, 201 Wis. 2d 337, 355, 548 N.W.2d 817 (1996) (reiterating that the court endeavors "to give effect to every word so as not to render any part of the statute superfluous.") (internal quotation marks and citation omitted).
¶ 109. Tellingly, the majority's device for invalidating marriages exists, by its own account, only to nullify marriages after death. It professes to preserve the common-law rule that "[w]hen the parties to a marriage are alive, the appropriate remedy for voiding a marriage is annulment" whereas "when one of the parties died ... a declaration that a marriage was void was the proper remedy." Majority op., ¶ 37 (footnote omitted). To translate, the courts utilize the "declaration of voidness" specifically and exclusively so as to eviscerate the legislature's deadline for invalidating marriages. Though it should not be necessary, I feel compelled to note that on non-constitutional matters the legislature can overrule the courts, not vice-versa. See, e.g., Challoner v. Pennings, 6 Wis. 2d 254, 257, 94 N.W.2d 654 (1959) (recognizing that the legislature "may by amending a statute nullify a supreme court decision . . . .") (citation and internal quotation marks omitted).
D. THE COMMON LAW DOES NOT SUPPORT THE ASSERTED POWER
¶ 110. To bolster its infirm statutory argument, the majority seeks refuge in the common law. See *232 majority op., ¶¶ 37-60. There are a number of fatal flaws with its approach. Starting with the threshold question, it is not clear, even in theory, how the common law can work in tandem with the other elements of the majority's reasoning. After all, everything else in the case is, by the majority's own lights, statutory: marriage itself is statutory, id., ¶ 30, the factors rendering marriages void are statutory, id., ¶ 33, annulment is statutory, id., ¶ 35, and the Declaratory Judgments Act is statutory. Id., ¶ 66. Apparently we are meant to believe that in this field of law, entirely occupied by statute, the "voiding" of marriages somehow snuck in from the common law, even though, as explained above, that power flies in the face of the governing statutory provisions. It is a leap of faith a little too far.
¶ 111. At any rate, the supposed common-law doctrine upon which the majority is premised simply does not exist. From Wisconsin's earliest years as a state, its courts[3] have been relentlessly imprecise on the matter of whether annulment is the sole avenue for questioning a marriage or simply one option amongst others. Some cases took the former position. See, e.g., Falk v. Falk, 158 Wis. 2d 184, 189, 462 N.W.2d 547 (Ct. App. 1990) ("Annulment is the proper procedure for setting aside both void and voidable marriages.") (citations omitted). Others the opposite. See, e.g., Ellis v. Estate of Toutant, 2001 WI App 181, ¶¶ 15-17, 247 Wis. 2d 400, 633 N.W.2d 692 (permitting trial courts to invalidate marriages pursuant to the Declaratory Judgments Act). Still others appeared to take both positions *233 at once. See, e.g., Williams v. Williams, 63 Wis. 58, 69, 75, 23 N.W. 110 (1885) (indicating at one point that when a party desires to invalidate a marriage "the action should be to . . . annul" the union, while indicating elsewhere that a void marriage may be called into question "in any proceeding in any court between any parties . . . ."). Yet another group of cases employed language conflating annulment with a judicial declaration of invalidity, making it difficult to ascertain whether there was even a difference between the two. See, e.g., Lyannes v. Lyannes, 171 Wis. 381, 388, 177 N.W. 683 (1920) (discussing the power of a circuit court "to annul and declare as void ab initio a marriage ....") (emphasis added).
¶ 112. The variation in language is not surprising when one considers how closely related and commonly used these different words are in judicial parlance. A court could not be reasonably expected to refrain from using a word like "declare" or "void" while discussing annulment when such terms were perfectly accurate in context. See, e.g., Falk, 158 Wis. 2d at 191 (remarking on a marriage that was "void as a result of the annulment . . . ."). Moreover, there was no decision clearly finding an independent power to declare a marriage void outside of annulment until quite recently, see ¶¶ 116-17 infra, so the courts can hardly be faulted for inadvertently using language that later gave birth to a distinction they had no good reason to anticipate.
¶ 113. It is also important to remember, though the majority would have you forget, that this ambiguity was largely linguistic, not legal. Whatever phraseology courts may have adopted, inexact though it may have been, their holdings were consistent. As a long and soundly-reasoned chain of cases explains, a marriage can be lawfully undone only through one of two statu *234 tory vehicles: divorce or annulment. Wheeler v. Wheeler, 76 Wis. 631, 633, 45 N.W. 531 (1890) ("[W]here the marriage is valid, the judgment is ... for a divorce; but where the marriage is void, the judgment is to annul it."). Judges enjoy no equitable (or "declaratory," to use the majority's nomenclature) power to act outside those well-paved avenues. Kuehne v. Kuehne, 185 Wis. 195, 196, 201 N.W. 506 (1924) ("[T]he jurisdiction of a court to annul a marriage is statutory, and. . . such a judgment may be entered only for the reasons authorized by statute.") (citation omitted). When the legislature saw fit to end that avenue at death, the courts were thenceforth duty-bound to comply. McCabe, 197 Wis. 2d at 713 n.3 ("Although 'void,'" a marriage contracted in violation of the statutes "governs legal relations unless it is annulled.... This may not be done after one of the parties to the marriage dies.") (citations omitted).
¶ 114. In short, there is no case law establishing a mechanism for voiding a marriage after death other than annulment. Quite to the contrary, the better and clearer case law has always held that courts could use annulment and annulment alone to invalidate marriages, and that they were constrained to follow the procedures constructed by the legislature when they did so. Viewing the cases in the light most charitable to the majority, it has at best a smattering of inconsistent language here and there, some intimating the existence of an independent mechanism, some intimating its nonexistence, some intimating both simultaneously, and some collapsing annulment into "voiding." To glean from this discordant hodgepodge an unambiguous statement of judicial power is, to put it mildly, a stretch.
¶ 115. In fact, a close examination of the majority opinion reveals some evasiveness on this point. The relevant section is given the definitive heading, "Courts *235 Have the Power to Declare a Marriage Void After the Death of One of the Parties to the Marriage." In the same vein, the body of the section begins with the following overview:
When the parties to a marriage are alive, the appropriate remedy for voiding a marriage is annulment. However, at common law, when one of the parties died, such that any impediment to a valid marriage was no longer capable of being corrected, a declaration that a marriage was void was the proper remedy.
Majority op., ¶ 37 (footnote omitted). With one arguable exception, discussed in a moment, the cases cited in the following section cannot fairly be characterized as standing for such a proposition, and the majority, to its credit, does not even attempt to make the case that they do. The teaching that the majority actually, and accurately, draws from the cases is merely that Wisconsin courts historically allowed for the posthumous invalidation of marriage, not that such invalidations could be obtained through a "declaration of voidness." See id., ¶ 48 ("[T]he Williams court concluded that a void marriage, whatever the mechanism or process for challenging the validity of the marriage, may be challenged in the lifetime or after the death of the marriage parties . . . .) (emphasis altered); id., ¶ 54 ("[T]he Lyannes court continued to recognize the ability of a court to invalidate a marriage after death.") (emphasis added) (footnote omitted); id., ¶ 57 ("According to the" court in Davidson v. Davidson, 35 Wis. 2d 401, 151 N.W.2d 53 (1967), "the issue of whether to allow the annulment action to continue depended upon whether the marriage was void or voidable . . . .").
¶ 116. It is quite true that these and other cases recognized that a party could challenge a marriage after *236 one of the spouses passed away, and quite beside the point. Until 1977, there was, with one exception,[4] no prohibition on annulling a marriage when one of the partners in the marriage was deceased. It therefore hardly comes as a surprise that courts allowed for such annulments. That in no way implies the existence of an independent type of challenge, i.e., the so-called "declaration of voidness."
¶ 117. The only case that holds to the contrary is Toutant, which justifiably receives most of the majority's attention. See majority op., ¶¶ 37-42, 65. In that case, handed down in 2001, the court of appeals granted, for the first time in Wisconsin history, a power to circuit courts to "declare" marriages "void" under the Declaratory Judgments Act. But Toutant cannot support the majority's "common-law" rule either, for two reasons: 1) it was not a common-law decision and 2) its reasoning is obsolete. The first point is self-evidently true because Toutant itself situated the power to "declare voidness" in the Declaratory Judgments Act, a statute, not in the common law. 247 Wis. 2d 400, ¶ 22.
¶ 118. As for the second point, one need only take a moment to consider Toutant's own succinct articulation of its reasoning:
Wisconsin Stat. § 767.03 states, "No marriage may be annulled or held void except pursuant to judicial proceedings. No marriage may be annulled after the death of either party to the marriage." While the first sentence expressly prohibits both the annulment or voiding of a marriage except pursuant to court proceedings, the second sentence pointedly prohibits only annulment after the death of either spouse. Thus, a marriage can be *237 declared null and void after the death of a spouse. All arguments concerning annulment are therefore immaterial.
Id., ¶ 16 (emphasis added). In other words, Toutant explicitly relied upon the "or held void" language that the legislature subsequently excised. The majority deems the removal of that language a routine, housekeeping clarification, noting that the drafters declined to announce that they were responding to Toutant. Majority op., ¶ 76. It makes no difference whether they were or not. What matters is that the Toutant court certainly ascribed meaning to the language, and undoubtedly would not have ruled as it did in the absence of those three now-erased words. Consequently, the only precedent even remotely supportive of the majority's thesis is, in light of the rationale underlying that precedent, outdated.
E. EVEN IF THE COMMON LAW SUPPORTED THE ASSERTED POWER, IT WAS ABROGATED BY THE LEGISLATURE
¶ 119. Granting arguendo the existence of this nonexistent common-law doctrine, there remains the intractable problem of the 2005 revisions. The court writes off those revisions as insufficiently clear and unambiguous to displace the common law. Majority op., ¶ 77. To the contrary, I do not see how the legislature could have been clearer or less ambiguous. The "or held void" language was there, and then it was gone. And it is entirely absent from the rest of the marriage statutes,[5] including, most conspicuously, Wis. Stat. § 767.001, which lists "actions affecting the family" and *238 notably omits any mention of "holding void," "declaring void," or the like. If such decisive action cannot abrogate the common law, what can? Simply and plainly put, when the legislature removed the phrase "or held void" from the statutes, whatever right an individual might have had to invalidate a marriage outside of annulment was removed with it.
¶ 120. Interestingly, as an example of clear and unambiguous abrogation, the majority points to the legislature's prohibition of posthumous annulments on consanguinity grounds. Majority op., ¶ 54 n.17.1 could not agree more. But if a ban on posthumous annulments in one narrow, confined set of circumstances is clear and unambiguous, why is the legislature's 1977 ban on all posthumous annulments not as well?
F. POLICY CONSIDERATIONS DO NOT SUPPORT THE ASSERTED POWER
¶ 121. The majority concludes with a recitation of the policy goals advanced by its rule. Majority op., ¶¶ 78-80. Now, we are assured, "an incompetent decedent's estate or an aggrieved party" will not be "simply out of luck" and "a court's power to address *239 fraud, mistake, and other exigencies in a disputed marriage" will be preserved. Id., ¶ 79-80. Valid considerations, to be sure. As is so often the case, however, there are equally valid considerations on the other side of the equation. Just as the limitation embodied in Wis. Stat. § 767.313, if we faithfully enforced it, would unfairly disadvantage some individuals, the limitless access to declaratory judgments made possible by the majority will unfairly disadvantage others.
¶ 122. Consider the case of a fully competent wife who marries a fully competent husband. The husband's relatives want nothing to do with him until he grows ill, at which point they manage to obtain a questionable medical opinion that he was incompetent when he signed the wedding certificate. Upon the husband's death, the relatives go to court, seeking to nullify the marriage and inherit the assets that would otherwise pass to the wife. Though the marriage "will be presumed valid," majority op., ¶ 81, the unscrupulous relatives have the benefit of documentary medical evidence, and the innocent wife may have only her own, self-interested (albeit truthful) word. Is such a scenario more inequitable than the hypotheticals feared by the majority?
¶ 123. None of which is to say that this describes McLeod's situation. Nor is it to say that the worries on one side of the ledger are more compelling than those on the other. It is only to show that the policy choice here is a difficult one, with powerful competing interests at stake. In forbidding posthumous annulments, the legislature made that difficult choice. It is not for us to second-guess its judgment. See, e.g., Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶ 60, 281 Wis. 2d 300, 697 N.W.2d 417 ("When acting within constitutional limitations, the legislature settles and declares *240 the public policy of a state, and not the court.") (internal quotation marks and citation omitted).
¶ 124. Like most mythical creatures, the power to "declare a marriage void" is neither fish nor fowl, neither statutory, nor judge-made, nor a legitimate policy decision made by the appropriate branch of government. It may have roamed the earth once, but if so it has long since gone extinct.
II. CONCLUSION
¶ 125. The legislature has not been blameless in generating the confusion that has led to the present state of affairs. At the very least, it could have made plain its intention in removing the "or held void" language in 2005. Presumably it will be aware of the court's decision, and hopefully it will take the opportunity to lay to rest, once and for all, the persistent uncertainty that has plagued this important issue for too long.
¶ 126. When the legislature does revisit the question, it might keep in mind the worryingly extreme consequences of its current all-or-nothing approach. Under the majority's misguided reading of the law, as noted, a marriage can apparently be challenged at any time after the death of a party, no matter the circumstances or the evidentiary obstacles. Under the correct reading of the law, as set forth here, equally disturbing situations may arise. A marriage between, say, a minor and an adult, would remain valid after the death of the adult, even if uncontested documentation established the voidness. Cf. McCabe, 197 Wis. 2d at 713 n.3 ("Although 'void,'" a marriage contracted in violation of the statutes "governs legal relations unless it is annulled .... This may not be done after one of the *241 parties to the marriage dies.") (citations omitted). This is so because annulment is the only means to invalidate a marriage that is either void or voidable. Falk, 158 Wis. 2d at 189. The law has not drawn any further distinctions within the void category regarding marriages in which there is incontrovertible evidence, like a birth certificate in the preceding example, obviating the need for any further fact-finding. It may make good sense, as a policy matter, for the legislature to allow courts to invalidate such marriages.
¶ 127. In the meantime, I would hold, for the reasons stated, that the circuit court properly declined to exercise a power it did not possess, and would therefore affirm its decision. Because the majority instead elects to give a longstanding misunderstanding the force of law, I respectfully dissent.

 I agree with the majority's conclusion that the incompetence of a spouse renders a marriage void, not voidable. See majority op., ¶¶ 61-64. That common ground does not alter the bottom line, however, because annulment is the exclusive mechanism for invalidating any marriage, void or voidable, Falk v. Falk, 158 Wis. 2d 184, 189, 462 N.W.2d 547 (Ct. App. 1990), and for the reasons set forth below annulment cannot be utilized after death.

 All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 Unlike the majority, I do not find authorities concerning other jurisdictions relevant to the analysis. On the contrary, as this discussion makes clear, the legislative and judicial developments that resolve the appeal are highly specific and unique to our state.

 See Wis. Stat. ch. 109, § 2351(2) (1909) (providing that an action to annul a marriage on the grounds that the spouses were cousins could not be brought after death).

 Wisconsin Stat. § 766.01(7) defines "dissolution" with reference to "a decree of dissolution, divorce, annulment or decla *238 ration of invalidity .. . ." (Emphasis added.) However, it also notes that "[t]he term does not include a decree resulting from an action available under Ch. 767 which is not an annulment, a divorce or a legal separation." § 766.01(7). Because the majority rightly recognizes that a "declaration of voidness" is not available under the annulment statute, this definitional provision does not suggest that Wisconsin law allows for any "declaration of invalidity" outside of the annulment statute. Likewise, Wis. Stat. § 767.803 makes passing reference to "marriages declared void" but there is no evidence that it means anything other than "annulled marriages," which is precisely how it has been interpreted. Rascop v. Rascop, 274 Wis. 254, 79 N.W.2d 828 (1956). These provisions have no bearing on the case.